Richard L. BALTHAZAR

v.

SUPERIOR COURT OF the COMMONWEALTH OF MASSACHUSETTS.

Civ. A. No. 74-5799-T.

United States District Court,
D. Massachusetts.

Feb. 17, 1977.
Substitute Order March 9, 1977.

Prisoner's Rights Project, Susan J. Baronoff, Mass. Defenders Committee, Boston, Mass., Malvine Nathanson, William A. Nelson and Bruce R. Bono, Boston, Mass., for Balthazar.

Barbara A. H. Smith, A. A. G., Boston, Mass., for Superior Court of Com. of Mass.

## OPINION

TAURO, District Judge.

This is an action for a writ of habeas corpus under 28 U.S.C. § 2241 brought by a petitioner who had been charged with having committed an "unnatural and lascivious" act in violation of Mass.Gen.Laws ch. 272, § 35; and with assault by means of a dangerous weapon in violation of Mass.Gen. Laws ch. 265, § 15B. Both charges arose out of the same incident. Following trial in the superior court he was convicted of the former charge, but was acquitted of the assault charge. His conviction for having committed an "unnatural and lascivious" act was affirmed by the Supreme Judicial Court, *Commonwealth v. Balthazar*, (1974) Mass., 318 N.E.2d 478. That court then denied petitioner's request for a rehearing. Subsequently, the superior court also denied petitioner's request for a new trial. Mass. Gen.Laws ch. 278, § 29.

The petitioner challenges his conviction here principally on the ground that the statute under which he was convicted is so vague as to violate due process. As a corollary to that contention, he claims that the instructions of the trial judge, on the meaning of the statute, failed to cure its vagueness and did not provide the jury with an intelligible standard against which to measure his guilt or innocence. Finally, petitioner contends that, as a matter of due process, the Supreme Judicial Court was required to remand his case for a new trial, rather than merely to affirm his conviction. He claims this entitlement to be retried because of that Court's narrowed construction of Mass.Gen.Laws ch. 272, § 35, announced in his case. *Commonwealth v. Balthazar, supra.*

In response, respondent asserts first, that Mass.Gen.Laws ch. 272, § 35 is not void for vagueness as it does give fair warning of the statutorily proscribed conduct. Second,

it is argued that the trial judge's charge to the jury contained no reversible error. Finally, respondent suggests that petitioner's contention, that he is entitled to a new trial, was not exhausted at the state level; is not of constitutional magnitude; and was effectively waived at trial.

This court holds that petitioner has satisfied his obligation to exhaust under 28 U.S.C. § 2254. On the merits, the court holds that Mass.Gen.Laws ch. 272, § 35 was void for vagueness at the time it was applied to petitioner's conduct, in that it did not give the petitioner fair warning that his conduct was statutorily prohibited. A writ of habeas corpus will issue. The court rules further that, although unconstitutional at the time applied in petitioner's case, the challenged statute may no longer be considered impermissibly vague, the Supreme Judicial Court having recently rendered clarifying opinions which have remedied the statute's constitutional defects.[1]

## I

### Factual Background

On June 7 to 11, 1973, the defendant was tried in Norfolk Superior Court. The Commonwealth's principal witness was Eileen Lomprez, age 22, of Malden, the victim of the alleged crime. According to her testimony, she was visited at her home on Sunday, July 9, 1972, by her 16 year old sister who lived in Exeter, New Hampshire. That afternoon, a neighbor drove Lomprez and her sister, who was returning home, to a Boston bus terminal, arriving there at 3:30 p. m. They discovered that the Exeter bus did not leave until 6:00 p. m. Lomprez's sister decided to take a bus leaving for Hampton Beach, New Hampshire at 4:00. The fare to Hampton Beach was 50 cents more than the fare to Exeter. Lomprez gave all her money to her sister to meet the additional fare.

Lomprez remained with her sister until the Hampton Beach bus was scheduled to leave, because her sister did not want to remain alone in the Boston bus terminal. Her neighbor did not wait for her. No arrangements were made with the neighbor to pick her up later, nor did she ask to borrow any money for the trip home.

After her sister left, Lomprez decided to visit a friend, in hopes of borrowing money to return home. She walked down Boylston Street to Copley Square, turned right at Exeter Street, eventually reaching the corner of Exeter and Commonwealth Avenue. At that point, a light blue Volkswagen pulled up. Although Lomprez could not see the driver, she thought the car belonged to Eddie Seals, a friend from South Boston. Accordingly, when the car stopped and the driver opened the door, Lomprez got in. It was only when she sat down, closed the door and looked at the driver, that she realized that the driver was not Seals.

Recognizing her mistake, Lomprez said, "I'm sorry" and started to get out. At that point the driver pulled a hunting knife out of his pocket with his right hand and pointed it at Lomprez without touching her. He then put the knife away and drove off. They drove through the streets of Boston to an area with signs reading "Quincy" and "South Shore 128." At a Holiday Inn, they turned down a dirt road and the car stopped. At some point during the ride, Lomprez noticed that the car had a manual transmission.

Upon arriving at their destination, the driver took out his knife once again and Lomprez got out of the car and started to run. The man grabbed her and led her down a hill. He ordered her to undress, but when she refused to do so he again took out the knife and threatened to kill her. She then undressed, and the man, by again threatening to kill her, forced her to perform an act of fellatio and to put her "tongue on his backside." Afterwards he mentioned girls getting raped and killed. Lomprez started crying. They then got dressed and the man gave her a cigarette.

---

1. Because of this court's resolution of the vagueness question, it is unnecessary to address petitioner's remaining contentions re-garding the jury charge and the narrowed statutory construction.

She attempted to distract her assailant by discussing astrology. They eventually returned to his car.

Lomprez re-entered the passenger side and the man went to the driver's side. She made no attempt to run and did not scream. The driver then backed the car out of the woods and they began the return trip to Boston. En route, they had what Lomprez later termed a "friendly" conversation, including a discussion of her daughter. They tentatively agreed to meet again at the Trailways Bus station the following Saturday, at 1:30 p. m. The man then dropped Lomprez off at the Washington Street M.B.T.A. station after giving her $1.00 to get home. As the car drove away, she did not look back to see the license plate.

Lomprez arrived home at approximately 8:30 p. m. and told a friend what had happened. The following day she reported the incident to the Malden and the Boston Police. She provided a description of her alleged assailant and told police about their planned meeting later that week.

On Saturday, July 15, at approximately 1:00 p. m., the defendant was arrested by Boston police near the Trailways Bus terminal in downtown Boston. At a line-up and later at trial, Lomprez identified the defendant as her assailant.

The defendant did not testify in his own behalf. He did call Dr. A. Walter Ciani, an orthopedic surgeon. Dr. Ciani had examined the defendant on April 9, 1973, and found his right shoulder muscles to be extremely weak. Because of this condition, the defendant underwent surgery which destroyed the mobility of the shoulder joint. As a result, the shoulder blade, upper arm bone and elbow could function only as one

unit. The only muscles defendant could use in that area were the shoulder muscles. These were so weak that defendant could move his right arm no more than 10 or 15 degrees in any direction. His grip in his right hand was only 20 pounds compared with 95 pounds in his left hand.

The doctor concluded that it would be impossible for defendant to raise his right arm to shoulder level and that he would be unable to place his arm around anybody's neck. This conclusion conflicted with the victim's testimony, at a probable cause hearing, that her assailant had put his arm around her neck. The doctor also stated that the defendant would have considerable difficulty operating a manual shift. He went on to say that it would be difficult for the defendant to place a knife in his jacket or pants pocket with his right hand.

Both sides stipulated that if the defendant's father were called, he would have testified that the defendant had not owned an automobile for three years; that his driver's license was limited to automatic shift cars; that his disability had existed since 1955; and that the defendant had not, to his father's knowledge, driven a car since his license had been suspended, apparently before July 1972.

No evidence was introduced as to whether Lomprez had consented to the sexual act alleged.

## II

### Exhaustion

In the federal system, a writ of habeas corpus is only granted upon petitioner's exhaustion of available state court remedies.[2] This "prerequisite" or "precondition"[3] is founded in principles of comity.

---

**2.** 28 U.S.C. § 2254 provides in pertinent part:

(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

**3.** *Pitchess v. Davis,* 421 U.S. 482, 486–87, 95 S.Ct. 1748, 44 L.Ed.2d 317 (1975).

Some ambiguity exists as to whether exhaustion is a jurisdictional prerequisite. *Pitchess v. Davis,* 421 U.S. 482, 95 S.Ct. 1748, 44 L.Ed.2d 317 (1975); *Fay v. Noia,* 372 U.S. 391, 434–35, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *Brathwaite v. Manson,* 527 F.2d 363, 366 (2nd Cir. 1975), *cert. granted,* 425 U.S. 957, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976); *Donovan v. Delgado,* 339 F.Supp. 446, 454 (D.P.R.1971); *but see Foley v. Commonwealth,* 310 F.Supp. 1330 (D.Mass. 1971). Authority is split, therefore, as to whether exhaustion can be waived by counsel. *Compare Needel v. Scafati,* 412 F.2d 761, 766 (1st Cir.), *cert. denied,* 396 U.S. 861, 90 S.Ct. 133, 24 L.Ed.2d 113 (1969), *with Brathwaite v. Manson,* 527 F.2d at 366.

■ Here, the respondent raises an exhaustion objection to only one of petitioner's claims [4]—that he has an entitlement under the due process clause to a new trial at which he could raise the defense of consent, a defense created by the Supreme Judicial Court in its decision affirming his conviction. Both parties agree that the consent defense issue is not being raised for the first time in this federal proceeding. It was previously made to the Supreme Judicial Court on a motion for rehearing and to the superior court on a motion for a new trial. The fundamental exhaustion issue is whether petitioner should be required to appeal the superior court's denial of a new trial.

■ A chronicling of the history of petitioner's search for relief in the state forums leads this court to the conclusion that there has been exhaustion of the consent theory. Prior to the Supreme Judicial Court opinion in this case, *Commonwealth v. Balthazar,* (1974) Mass., 318 N.E.2d 478, it was black letter law that consent was not a defense to an alleged violation of Mass.Gen.Laws ch. 272, § 35. Understandably, therefore, petitioner did not raise any question of consent before the trial court or the Supreme Judicial Court on direct appeal.[5]

Petitioner first raised the consent argument to the Supreme Judicial Court on petition for rehearing in light of that court's decision, announced in petitioner's own appeal, to recognize henceforth consent as a defense in cases alleging violation of Mass. Gen.Laws ch. 272, § 35. Upon denial of rehearing, the petitioner filed this request for habeas corpus relief. This court stayed any further action in this petition pending possible resolution in the Court of Appeals of a similar exhaustion question in *Haefeli v. Chernoff,* 526 F.2d 1314 (1st Cir. 1975). Because the First Circuit opinion in *Haefeli* did not resolve the exhaustion problems relevant to this case, this court took an additional step to ensure that the dictates of § 2254 were satisfied. Proceedings were stayed further, and petitioner was directed to move for a new trial in the state court. Such a motion was made to the superior court and was denied. Having complied with my directive, the petitioner then returned to this court to renew his quest for habeas corpus relief, only to find respondent again asserting a lack of exhaustion.

This court rejects respondent's argument that comity requires the federal court to continue to refrain from reaching the merits of petitioner's claim. As a per curiam Court stated in *Wilwording v. Swenson,* 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971),

> Section 2254 does not erect insuperable or successive barriers to the invocation of federal habeas corpus. The exhaustion requirement is merely an accommodation

**4.** Where a habeas corpus petitioner has exhausted less than all of his interrelated claims, a federal court may decline to hear any of the claims. *Johnson v. U. S. District Court of Nebraska,* 519 F.2d 738 (8th Cir. 1975). But see *Tyler v. Swenson,* 483 F.2d 611 (8th Cir. 1973).

**5.** By affidavit, petitioner's counsel explains his decision not to raise a consent defense prior to the SJC opinion in *Balthazar, supra.* A consent defense generally requires the defendant to take the stand. The essence of defendant's testimony would have been that he had performed the acts charged, but with Lomprez's consent. Because of the likelihood that the trial court would have refused to instruct the jury that consent was an available defense, defendant would probably have convicted himself with his own testimony. June 9, 1976 Affidavit of Bruce R. Bono.

of our federal system designed to give the State an initial 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights. *Fay v. Noia,* 372 U.S. 391, 438 [83 S.Ct. 822, 848, 9 L.Ed.2d 837] (1963).

*Id.* at 250, 92 S.Ct. at 408. Certainly the courts of the Commonwealth have had several opportunities to decide petitioner's position on the consent issue.

The first opportunity came upon petitioner's motion for rehearing before the Supreme Judicial Court. Respondent cites no authority for its assertion that such a motion is an "inappropriate vehicle" for exhaustion. A contrary conclusion is suggested by a recent decision in this circuit, *Haefeli v. Chernoff,* 394 F.Supp. 1079 (D.Mass.1975), *rev'd on other grounds* 526 F.2d 1314 (1st Cir. 1975). In that case, the defendant was convicted in the superior court of knowingly receiving stolen property. His conviction was affirmed on appeal to the Supreme Judicial Court. *Commonwealth v. Haefeli,* 361 Mass. 271, 279 N.E.2d 915 (1972). The defendant petitioned this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. During hearing, the court discovered that the record upon which the Supreme Judicial Court based its affirmance was inaccurate. A stay was granted to give the parties an opportunity to apprise the Supreme Judicial Court of the inaccuracy and to request a rehearing. In denying the request for a rehearing, the Supreme Judicial Court suggested that petitioner could move for a new trial in the superior court. Upon petitioner's failure to seek a new trial, the respondent argued that there was a failure to exhaust state remedies under § 2254. This court rejected that argument stating, "[T]he exhaustion doctrine does not require that a habeas petitioner pursue all possible avenues of state collateral relief before a federal court may hear his constitutional claim. (citations omitted)." *Haefeli v. Chernoff,* 394 F.Supp. 1079, 1081, n. 5 (D.Mass.1975). The First Circuit, on appeal, apparently agreed since it rendered its opinion on the merits. *Haefeli v. Chernoff,* 526 F.2d 1314, 1317, n. 8 (1st Cir. 1975). While *Haefeli* and the instant case are distinguishable as to their substantive issues, *Haefeli* does offer support for the position that a petition for rehearing may satisfy, in a given set of circumstances, the exhaustion requirement.

Respondent argues further that the petitioner at bar must appeal to the Supreme Judicial Court from the superior court's denial of a new trial. Whatever merit such an argument might have in another case, it has none in the instant case. Here, the motion for new trial raising the consent issue was preceded by a motion for rehearing by the Supreme Judicial Court raising the same issue. These motions were attended by a stay of federal proceedings, a matter that was brought to the attention of both state courts. Certainly the potential significance of the issue was brought to the attention of the Supreme Judicial Court. To say that exhaustion does not obtain here because the moving document was entitled "motion" rather than "appeal" would be to honor form over substance. Both state and federal courts are too busy to require, for such trivial reasons, essentially duplicative filings by counsel.

■ The doctrine of exhaustion does not require repetitive or futile applications to the state courts. *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). What is required is that a state court be given an opportunity to consider a claim *if it wants to do so.* Given the opportunity and a clear indication that the state court is not inclined to consider the issue, a federal court must assume its constitutionally mandated obligations.

### III

### VAGUENESS

At trial in the superior court, petitioner was convicted on one count of violating Mass.Gen.Laws, ch. 272, § 35 for committing fellatio and oral-anal contact. That section provides:

> Whoever commits any unnatural and lascivious act with another person shall be punished by . . ..

Petitioner has challenged this statute at every stage of the litigation, on the theory that it is unconstitutionally vague.

The trial court denied a motion to dismiss on a vagueness claim, suggesting that such an argument was more appropriately addressed to the state appeals court or Supreme Judicial Court.

The Supreme Judicial Court affirmed the trial court on direct appeal, in *Commonwealth v. Balthazar* (1974) Mass., 318 N.E.2d 478 recognizing, however, that the words of the statute, "standing alone, present some question as to their meaning, even if they had a generally understood signification in 1887 when they were first expressed in the statute from which § 35 is derived." *Id.* at 480. The Court was persuaded that common law guidance as to the statute's meaning, coupled with judicial construction of the terms in *Jaquith v. Commonwealth,* 331 Mass. 439, 120 N.E.2d 189 (1954), rendered the statute sufficiently precise to pass muster under the due process clause.[6]

Yet the statute did not escape unscathed the scrutiny of the Commonwealth's highest court. Acknowledging judicial articulation of privacy rights in sexual activities, including first amendment rights applied to portrayal of sexual conduct, and increasing societal tolerance of non-conforming sexual attitudes, the Supreme Judicial Court excluded private consensual adult conduct from the reach of Mass.Gen.Laws ch. 272, § 35. In so doing, that Court left unanswered the question of whether such a statutory narrowing was constitutionally required. *Balthazar v. Commonwealth, supra,* 318 N.E.2d at 481.

The gravamen of petitioner's vagueness attack is that the words of the statute, and their subsequent judicial interpretations, provide neither sufficient guidance to warn as to what conduct is proscribed, nor meaningful standards to prevent arbitrary application of the statutory terms. The imposition of criminal sanctions for offending what petitioner characterizes as non-specific, transitory, community sensibilities is said by him to violate the due process clause.[7]

The respondent answers that Mass.Gen. Laws ch. 272, § 35 provides sufficient warning of its prohibitions to meet the due process mandate. Primary emphasis is placed on the narrowing effect of judicial interpretations of Mass.Gen.Laws ch. 272, § 35. Respondent further suggests that petitioner is demanding an unreasonable, if not impossible, degree of specificity in an area where it is difficult to delineate exactly what conduct is and is not forbidden, an argument which might be said to cut two ways.

Basic to the vagueness doctrine is the concept "that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). The threshold problem in applying this principle, of course, is determining what should lead to a reasonable understanding of a statutory proscription. Traditionally, courts have attempted to meet this problem by examining the words of the statute in light of common usage, as well as seeking guidance from prior judicial interpretation of the challenged provisions.

For instance, in *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), the Court sustained a claim that a New Jersey statute forbidding certain persons from being a "member of any gang" was void for vagueness, finding that phrase to be ambiguous both on its face and in the light of commonly accepted definitions and

---

**6.** For a discussion of *Jaquith*, see text at p. 432, *infra.*

Several recent Massachusetts cases have reiterated the finding of the Supreme Judicial Court in *Jaquith* that Mass.Gen.Laws ch. 272, § 35 is not void for vagueness. *Commonwealth v. Morgan,* (Mass.1975) 339 N.E.2d 723; *Commonwealth v. Hanscomb,* (Mass.1975) 328 N.E.2d 880.

**7.** Cases from other jurisdictions cited as holding similar statutes to be unconstitutionally vague, include: *Harris v. State,* 457 P.2d 638 (Alaska 1969); *Franklin v. State,* 257 So.2d 21 (Fla.1971); *State v. Sharpe,* 1 Ohio App.2d 425, 205 N.E.2d 113 (1965).

judicial construction. By way of contrast, a Tennessee statute proscribing "crimes against nature" was recently upheld against a vagueness challenge in *Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 242, 46 L.Ed.2d 185 (1975). There, a per curiam Court relied upon the common usage and judicial interpretations of the phrase to support its holding that the statute met due process requirements of specificity.

In applying the vagueness doctrine, courts must accommodate the government's interest in enforcing broad rules of conduct with the public's interest in knowing what conduct is permitted and what is proscribed. As the Court said in *Colten v. Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), however,

> The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

*Id.* at 110, 92 S.Ct. at 1957.

■ Furthermore, this court must consider the vagueness of the statute as it is applied to the petitioner's conduct. Facial vagueness is an appropriate basis for attack only in first amendment cases. *U. S. v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). The question thus reduces to whether the language of § 35, or the state court constructions of it, indicate that it applies to fellatio or oral-anal contact.

■ Given these general principles, this court must consider the constitutionality of the challenged statute as of two distinct bench marks. The first is the time of petitioner's conduct. In evaluating the statute on a habeas corpus petition, primary attention should be focused on the law as it existed at the time of petitioner's arrest and conviction. *Royal v. Superior Court of N. H., Rockingham County,* 531 F.2d 1084, 1088 (1st Cir.) *cert. denied,* —— U.S. ——, 97 S.Ct. 178, 50 L.Ed.2d 147 (1976). The second bench mark is the present. The law must be re-examined to determine whether the challenged statute is constitutional today in light of judicial interpretations issued since petitioner's conduct.

The analysis must begin with the challenged phrase "unnatural and lascivious act." [8] The statute makes no attempt to define this term. It is necessary, therefore, to dissect this phrase in order to determine the intent of the legislature. "Lascivious" is a word used in common parlance as synonomous with "lewd." Webster's Third New International Dictionary (1971) defines lascivious as "tending to arouse sexual desire." Webster's legalistic counterpart, Black's Law Dictionary, 4th edition (1968) concurs in that definition. Courts have long applied prohibitions against lascivious conduct to indecent exposure. *Commonwealth v. Wardell,* 128 Mass. 52 (1880); *Cheesborough v. State,* 255 So.2d 675 (Fla.1971); 50 Am. Jur.2d at 450.

■ With respect to the phrase "unnatural act", dictionaries do not provide much assistance. Webster hedges by merely providing a synonomous cross-reference to crimes against nature. Yet "crimes against nature" constitute a distinct statutory offense in Massachusetts, Mass.Gen.Laws ch. 272, § 34, and, therefore, cannot be deemed the same as "unnatural act." Similarly, Black's Dictionary equates "unnatural offense" with sodomy—the target of the "crimes against nature" statute, Mass.Gen. Laws ch. 272, § 34.

At the time of the conduct which is the subject of this case, there was no judicial definition of the challenged phrase, "unnatural and lascivious acts," with sufficient specificity to satisfy due process require-

8. Mass.Gen.Laws ch. 272, § 53 proscribes "lewd, wanton and lascivious" behavior. Petitioner, however, was not charged with being a lascivious person in violation of § 53. The government is bound by its choice of offenses and it is reasonable to presume that the legislature had something more in mind than mere "lascivious" conduct when it proscribed "unnatural and lascivious acts."

ments. As of July 1972, the leading interpretation of § 35 was *Jaquith v. Commonwealth,* 331 Mass. 439, 120 N.E.2d 189 (1954), a case involving a vagueness challenge under both the Massachusetts and United States Constitutions. Without ever specifying the acts for which the petitioner was indicted, the Supreme Judicial Court upheld his conviction. The underpinning of that holding was the Court's conclusion that the words "unnatural and lascivious act" are of "common usage," "well defined, well understood, and (have) generally accepted meaning." Because this was the definitive opinion in the jurisdiction, it is worth quoting extensively from the Court's "definition."

> They ("unnatural and lascivious") signify irregular indulgence in sexual behavior, illicit sexual relations and infamous conduct which is lustful, obscene, and in deviation of accepted customs and manners (citation omitted). . . . It is enough to say that it generally has been held that the common sense of the community, as well as the sense of decency, propriety, and morality which all respectable persons usually entertain, is sufficient to apply the statute to a situation and determine what particular kind of conduct offends.

*Id.* at 192.

 Contrary to the state Court's implication, reference to dictionary definition reveals that the common usage of "unnatural acts" does not define this statute. Rather, it defines another statute, § 34. Further, the *Jaquith* attempt at definition seems to compound rather than resolve the ambiguity. The phrases "accepted customs, manners" and "sense of decency," while commendable as general guideposts, are a doubtful basis of "fair warning that certain kinds of conduct are prohibited," *Colten v.*

*Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 587 (1972). While a state may have a legitimate interest in protecting community sensibilites, criminal liability should only attach to clearly delineated transgression.[9] Currents of community standards are constantly shifting. These changes are sometime subtle. Standards are apt to vary from generation to generation without the specific awareness of either generation. This is true in the area of private sexual conduct, among others.

 The Supreme Judicial Court opinion in *Balthazar* graphically illustrates the consequences of this phenomenon. In that case, the Court cited the *Jaquith* definition of "unnatural and lascivious" with approval, but then acknowledged the *Jaquith* standard to be one that "may change with the passage of time." 318 N.E.2d at 480. This acknowledgment underscores the point that the public should not be required at its peril to anticipate a judicial pronouncement that public standards of morality have changed. It is the function of the legislature, not the judiciary, to establish what conduct is to be proscribed. Ideally, the statute itself should be clear enough to provide fair warning to the public. Of course, judicial interpretation of an otherwise imprecise statute can provide sufficient warning to meet due process requirements. But, here we are dealing with a statute general in terms which, at the relevant time, had not been defined by the Supreme Judicial Court as applying to petitioner's conduct.[10]

 The Massachusetts cases prior to July, 1972, the date of petitioner's conduct, did not perform that remedial function. They did not serve to provide "fair warning." On the contrary, those cases are distinguished by their delicate and ambiguous discussions of the conduct involved in § 35 cases. No reported case in the Common-

9. That is one teaching of *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) where the Court required that state obscenity laws specifically define the conduct subject to regulation.

10. The case of *Commonwealth v. Deschamps,* 294 N.E.2d 426 (Mass.App.Ct.1972) which was

issued on December 29, 1972 applied § 35 to fellatio but postdated the conduct in controversy here.

The lack of a case directly in point precludes any claim that petitioner is a hard core violator lacking standing to raise the vagueness claim.

wealth had expressly applied the "unnatural and lascivious" act prohibition to fellatio or oral-anal contact. Furthermore, judicial constructions of similar statutes in other jurisdictions provided little guidance. Some state courts had held unnatural act statutes to be unconstitutionally vague while other courts rejected such challenges.[11]

Therefore, accepting the "fair warning" test of *Colton* to be the applicable standard, this court holds that as of July, 1972, § 35 even when considered together with interpreting judicial opinions, was too vague as applied to petitioner's conduct and, therefore, his conviction was invalid under the due process clause.[12] Petitioner's prosecution and conviction thereunder must be set aside and a writ of habeas corpus must issue.

 The court is not willing, however, to hold that Mass.Gen.Laws ch. 272, § 35 is invalid today merely because it was unconstitutional as applied to petitioner in July of 1972. Much has transpired in the courts of the Commonwealth since the date of petitioner's alleged conduct, which has lent specificity and meaning to a once ambiguous statute. The most significant occurrence came in *Commonwealth v. Deschamps*, 294 N.E.2d 426 (Mass.App.Ct. 1972), where fellatio was held to constitute an unnatural act. Other recent cases have definitively applied § 35 to specific conduct. *Commonwealth v. LaBella*, 364 Mass. 550, 306 N.E.2d 813 (1974) (applying § 35 to cunnilingus). Furthermore, as was previously discussed, § 35 was significantly altered by the Supreme Judicial Court's opinion in *Balthazar*, limiting the statute's reach to non-consensual conduct. The clear impact of these decisions was to put the public on notice that § 35 forbids specific types of non-consensual sexual conduct, including fellatio.

Although they are commendable efforts to clarify chronically ambiguous areas of the law, the remedial impact that *Balthazar* and subsequent opinions have had on § 35 cannot save petitioner's prosecution and conviction. A "conviction cannot be sustained on appeal by a limiting construction which eliminates the unconstitutional features of the [A]ct, as the trial took place under the unconstitutional construction of the [A]ct." *Ashton v. Kentucky*, 384 U.S. 195, 198, 86 S.Ct. 1407, 1409, 16 L.Ed.2d 469 (1966); *accord, Royal v. Superior Court of N. H., Rockingham County*, 531 F.2d 1084 (1st Cir.), *cert. denied*, 429 U.S. 867, 97 S.Ct. 178, 50 L.Ed.2d 147 (1976).

### SUBSTITUTE ORDER

In accordance with the opinion of this court in the above captioned matter, dated February 17, 1977, it is hereby ORDERED that:

1. petitioner's request for a writ of habeas corpus is hereby granted,

2. petitioner's conviction on Norfolk Indictment No. 55689 is vacated,

3. Norfolk County Indictment No. 55689 shall be dismissed, and

4. This order shall be stayed for 30 days to allow defendant the opportunity to file a notice of appeal. If such an appeal is filed, this order shall be stayed pending resolution of the appeal by the Court of Appeals.

---

11. *Compare State v. Sharpe*, 1 Ohio App.2d 425, 205 N.E.2d 113 (1965), *with State v. Jones*, 8 Ariz.App. 381, 446 P.2d 487 (1968).

12. Thus this case is clearly distinguishable from *Rose v. Locke*, 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). The challenged phrase in that case, "crimes against nature," had a well established common law meaning, had been authoritatively construed by the state courts, and had been previously applied to the petitioner's conduct.