**UNITED STATES of America,**

v.

**NIPPON PAPER INDUSTRIES CO., LTD.; Jujo Paper Co., Inc.; and Hirinori Ichida; Defendants.**

**CR. No. 95–10388–JLT.**

United States District Court,
D. Massachusetts.

Sept. 3, 1996.

---

Charles E. Koob, James Kreissman, Jonathan Rosenberg, David E. Vann, Jr., Simpson, Thacher & Bartlett, New York City, Terry Philip Segal, Segal & Feinberg, Boston, MA, for Appleton Papers, Inc.

William H. Kettlewell, Boston, MA, for Jujo Paper Co., Ltd.

Richard G. Parker, O'Melveny & Myers, Washington, DC, William H. Kettlewell, Boston, MA, for Nippon Paper Industries Co., Ltd.

Michael B. Himmel, Christopher S. Porrino, Robert J. Kipness, Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, NJ, Terry Philip Segal, Segal & Feinberg, Boston, MA, for Jerry A. Wallace.

## MEMORANDUM

TAURO, Chief Judge.

The United States brings this criminal action against Nippon Paper Industries Co., Inc. ("Nippon"), alleging that its predecessor,

Jujo Paper Co., Inc. ("Jujo"), conspired in 1990 to fix prices of jumbo roll thermal facsimile paper ("fax paper") sold in the United States, in violation of section 1 of the Sherman Act, 15 U.S.C.A. § 1 (West Supp.1996). Presently before the court are Nippon's motions to dismiss on three alternative grounds: (1) lack of personal jurisdiction over Nippon, (2) failure of the indictment to state an offense under section 1 of the Sherman Act, and (3) failure of the indictment to adequately plead successor liability.

## I.

### BACKGROUND [1]

Nippon is a Japanese corporation with its principal place of business in Tokyo, Japan. Nippon was formed in 1993 as a result of a merger between Jujo and Sanyo Kokusaku Co., Ltd., both Japanese corporations with their principal places of business in Japan.

In 1990, Jujo manufactured fax paper at mills located in Japan. Jujo did not engage in direct export sales but, rather, sold its fax paper in Japan to Japanese trading houses. With regard to fax paper manufactured by Jujo that ultimately reached customers in the United States, Jujo's sales were limited to two Japanese trading companies, Japan Pulp & Paper Co., Ltd. ("JPP") and Mitsui & Co., Ltd. ("Mitsui"). JPP and Mitsui exported the fax paper to their respective subsidiaries in the United States and those subsidiaries engaged in direct sales to customers in the United States.

The government maintains that the conspiracy originated at meetings held in Japan in early 1990, during which Jujo and other Japanese manufacturers of fax paper "agreed to increase prices for fax paper to be imported in North America." Indictment ¶ 7(b). Although the indictment does not specify which alleged co-conspirators attended these meetings, the government conceded at argument on this motion that none of the Japanese trade houses nor their American subsidiaries participated in these meetings.

To effectuate this conspiracy, Jujo and the other manufacturers "raised their prices for fax paper" charged to the Japanese trading houses. The government further contends that Mitsui and JPP, and their American subsidiaries, became co-conspirators by agreeing to sell fax paper in North America at the newly raised price.

## II.

### DISCUSSION

#### A. Personal Jurisdiction

Congress, by way of the Federal Rules of Criminal Procedure, has provided for nationwide service of process of criminal summons. Fed.R.Crim.P. 4(d)(2). Service of process on a corporation may be effected within the territorial limits of the United States by:

delivering a copy [of the summons] to an officer or to a managing or general agent or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the corporation's last known address within the district or at is principal place of business elsewhere in the United States.

Fed.R.Crim.P. 9(c)(1).

On January 4, 1996, service by certified mail of a criminal summons was made upon Seiichi Masuko, the general manager of the larger of the two Nippon offices in Seattle. In January 1996, service of a copy of the criminal summons was made on Richard Parker, a partner of O'Melveny & Myers, who had been active in the law firms representation of Nippon throughout the grand jury investigation leading to the present indictment. Subsequently, in-hand service of the criminal summons on Seiichi Masuko was executed by a United States Marshal at Nippon's Seattle office.[2]

---

1. In outlining its background, the court accepts the government's characterization of the case as a conspiracy involving horizontal and vertical relationships. As explained in detail below, the parties dispute whether the indictment adequately pleads the theories of the conspiracy advanced by the government in its memorandum opposing Nippon's motion for failure to state a claim under section 1 of the Sherman Act.

2. Nippon previously challenged the propriety of the service of process. On March 13, 1996, Chief Magistrate Judge Alexander denied Nip-

The government contends that the court has jurisdiction over Nippon merely because a summons was served on Seiichi Masuko within the territorial boundaries of the United States pursuant to Rule 4. Alternatively, the government maintains that, because Nippon has sufficient contacts with the United States, service pursuant to Rule 4 gives this court jurisdiction over Nippon.

### 1. *Review of jurisdictional principles*

"Personal jurisdiction implicates the power of a court over a defendant." *Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 143 (1st Cir.1995). Historically, the presence of a defendant within the boundaries of the sovereign served as a prerequisite to its courts exercising jurisdiction over him. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Once presence existed, the manner in which such presence was procured did not alter the power of the court over that person. *See, e.g., Frisbie v. Collins*, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952) (jurisdiction existed over criminal defendant brought within border of sovereign by forcible abduction); *Chandler v. United States*, 171 F.2d 921, 933 (1st Cir.1948) (court may not refuse jurisdiction where fugitive is brought before it regardless of the means used to bring him within its territorial jurisdiction), *cert. denied*, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949).

■ With the advent of personal service of process, the scope of a sovereign's power expanded to include, under certain conditions, persons not present in its territory. *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158. Exercise of jurisdiction over persons not found within the sovereign's borders was held to be consistent with due process if the defendant has "certain minimum contacts with it such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* The modern doctrine of personal jurisdiction, thus, involves two distinct and independent bases for exercise of a sovereign's power: (1) physical presence of the person within the territorial boundaries of the sovereign, and (2) sufficient contacts with the sovereign to justify reaching him extraterritorially.

■ With respect to the latter basis for jurisdiction, the First Circuit has developed the doctrines of general and specific jurisdiction. *United Elec., Radio and Mach. Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1088 (1st Cir.1992). A court has general jurisdiction over a person "when the litigation is not directly based on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systemic activity, unrelated to the suit, in the forum state." *Id.* If general jurisdiction is lacking, a court determines whether it possesses specific jurisdiction by examining (1) the relatedness of the defendant's forum-state activities and the claim underlying the litigation, (2) the deliberateness of the defendant's contacts with the forum-state, and (3) the reasonableness of the exercise of jurisdiction in light of various Gestalt factors. *Pritzker v. Yari*, 42 F.3d 53, 60–61 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995).

■ Turning to adjudication of federal claims in federal courts, two factors must be examined: (1) the territorial limits on service of process defined by Congress, and (2) the constitutional constraints on Congress' definition of those limits. *See, e.g., S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2nd Cir. 1990). Courts have recognized that Congress may provide for nationwide service of process. *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 700 (1988). In providing for nationwide service, Congress defines the territorial jurisdiction of the federal courts as encompassing the entire nation. *Id.* at 671–72. As such, the Due Process Clause of the Fifth Amendment does not require that a defendant have sufficient contacts with the state in which the district court sits for there to be jurisdiction. *Johnson Creative Arts, Inc. v. Wool Masters, Inc.*, 743 F.2d 947, 950 n. 3 (1st Cir.1984); *Debreceni v. Bru–Jell Leasing Corp.*, 710 F.Supp. 15, 20–1 (D.Mass.1989).

pon's motion to quash. Nippon does not here challenge that decision.

With these principles in mind, the court turns to the issues raised by the parties: (1) whether Congress can authorize federal courts to exercise jurisdiction over an alien corporation, without regard to the contacts of that corporation to the United States, (2) whether service under Rule 4 authorizes a federal district court to exercise personal jurisdiction over an alien corporation, regardless of the substantiality of the contacts of that corporation with the state in which the district court sits, and (3) whether Nippon has sufficient contacts with the United States to warrant exercise of jurisdiction over it.

### 2. *Jurisdiction by virtue of service in the United States*

■■■■ The government contends that service under Rules 4 and 9, standing alone, is sufficient to create jurisdiction over Nippon. In advancing this position, the government argues by analogy from cases concerning the presence of individual criminal defendants. The Supreme Court explained in *Frisbie:*

> The Court has never departed from the rule announced in *Ker v. Illinois,* 119 U.S. 436 [7 S.Ct. 225, 30 L.Ed. 421] [1886] that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' No persuasive reasons are now present to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one *present* in court is convicted of a crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional safeguards."

342 U.S. at 533, 72 S.Ct. at 530 (emphasis added). As *Frisbie* implies, minimum contacts considerations do not apply to individuals who are served process within the territorial limits of the sovereign. *Burnham v. Superior Court of California,* 495 U.S. 604, 622, 110 S.Ct. 2105, 2116, 109 L.Ed.2d 631 (1990) (plurality opinion) (Scalia, J.); *Johnson Creative Arts,* 743 F.2d at 950 n. 3. And so, the government contends, service on an agent within the territory of the United States establishes the presence of an alien corporation.

The principal problem with the government's analogy lies with the concept of corporate presence. Corporations are legal constructions and their presence is, in some sense, fixed to the situs of their incorporation. Where nationwide service is applied to an American corporation this does not present a problem, insofar as jurisdiction can be acquired by service in its state of incorporation. But, process on an alien corporation at its place of incorporation would, of course, take place beyond the territorial limits of the United States.

Moreover, the government's suggestion that service on an officer of an alien corporation within the United States functions as the surrogate for the presence of the alien corporation leads to incongruous results. Consider service of process on the president of an alien corporation who merely happens to be vacationing in Florida, or changing airplanes at an American airport in route to a foreign destination. Is the corporation really "present" in the United States under such happenstance? As Judge Hand recognized, one cannot "impute the idea of locality to a corporation, except by virtue of those acts which realize its purposes." *Hutchinson v. Chase & Gilbert,* 45 F.2d 139, 141 (2nd Cir.1930). The vacationing foreign corporation president is likely not acting to serve his employer's purposes. Indeed, it was the problem of corporate presence that led the Supreme Court to articulate the minimum contacts test in *International Shoe. International Shoe,* 326 U.S. at 315–19, 66 S.Ct. at 157–60. *See also Intermeat, Inc. v. American Poultry Inc.,* 575 F.2d 1017, 1020–23 (2nd Cir. 1978) (explaining rise and fall of the corporate presence theory in the context of states' efforts to reach foreign corporations).

Further, contrary to the government's contention, the minimum contacts test is not limited to cases involving extraterritorial service on a corporation. In *International Shoe,* an agent of the corporate defendant had been served within the forum-state, pursuant to a state statute authorizing in-state service of process on agents of foreign corporations. *International Shoe,* 326 U.S. at 311, 66 S.Ct. at 156. As such, the issue before the Court involved the limits imposed by due

process on a sovereign's efforts to obtain in personam jurisdiction over a foreign corporation by in-state service on one of its agents. In holding that the sovereign only obtains personal jurisdiction where there are sufficient contacts, the Court implicitly found that the mere act of service on the agent did not render the corporation "present" in the state.

For these reasons, this court holds that the mere service of process on an agent or officer of an alien corporation within the United States does not without more establish the jurisdiction of a federal court over an alien corporation. Rather, as this court has previously decided in the context of a civil matter, service of such process is only effective to create in personam jurisdiction where a defendant has sufficient contacts with the United States. *See Debreceni*, 710 F.Supp. at 20–21 (where federal statute provides for nationwide service of process for a federal claim, the Constitution merely requires minimum contacts with the United States).

### 3. *Nationwide service in criminal antitrust actions*

■ Though Congress may bestow on a federal district court personal jurisdiction over an alien corporation without regard to the contacts between the district and the defendant, the question remains whether Congress has done so in this case. Nippon contends that the court should not construe Rules 4 and 9 of the Federal Rules of Criminal Procedure as providing federal district courts with jurisdiction on the sole basis of national contacts in criminal antitrust actions. Nippon advances two alternative arguments in support of this contention.

First, Nippon maintains that section 12 of the Clayton Act, 15 U.S.C.A. § 22 (West 1973), is the exclusive provision for nationwide service in antitrust cases. Section 12 of the Clayton Act provides:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C.A. § 22. Because prosecution in this district allegedly does not satisfy section 12's venue provision, Nippon avers that this court cannot exercise jurisdiction.

It is not clear, however, that section 12 of the Clayton Act applies to criminal prosecutions under the Sherman Act. *See United States v. National Malleable & Steel Castings Co.*, 6 F.2d 40, 43 (N.D.Ohio 1924) (section 12 of the Clayton Act applies only to civil suits). Moreover, even if section 12 applies to criminal actions, the cases interpreting section 12 demonstrate that it was intended to supplement rather than supplant general federal venue and service of process statutes and rules. *See, e.g., Board of County Comm'rs of Custer County v. Wilshire Oil Co. of Texas*, 523 F.2d 125, 129–30 (10th Cir.1975). Accordingly, the court concludes that service under Rules 4 and 9 may be relied on in federal antitrust prosecutions.

■ Second, Nippon contends that jurisdiction on the basis of national contacts is permitted only when the provision authorizing nationwide service also limits venue to a federal district in which the alien corporation can be found.[3] Any other reading, Nippon suggests, would violate due process. Nippon cites no authority for this novel proposition and the court has found none. The reason for this absence of precedent is found in the Constitution itself, which imposes specific limits on the place of a criminal prosecution. Article III, section 2 requires that trial of crimes shall be held in the state where the crime was committed. The Sixth Amendment provides that criminal defendants are entitled to trial "by an impartial jury of the State and district wherein the crime shall have been committed." In light of the Constitution's venue and vicinage provisions, this court will not divine a generalized due process right requiring an additional nexus be-

3. Fed.R.Crim.P. 18 limits venue to a district in which the offense was committed. For purposes of its motion to dismiss for lack of personal jurisdiction, Nippon does not challenge the government's allegation that co-conspirators committed overt acts in Massachusetts in furtherance of the conspiracy.

tween a criminal defendant and a federal judicial district.[4] *See generally O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, ——, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994) (expression of one thing implies exclusion of others).

Moreover, the proposition advanced by Nippon has been rejected by the Supreme Court. In *United States v. Union Pacific R.R.*, 98 U.S. (8 Otto) 569, 603–04, 25 L.Ed. 143 (1878), the Court held that Congress could make a court in Washington, D.C. the exclusive forum for certain claims arising under federal law. If Congress can establish one court within the United States to here all claims without regard to a defendant's contacts to that place, it inescapably follows that Congress can designate any place within the United States as an appropriate forum for federal claims.

Accordingly, this court concludes that the absence of a provision in the Federal Rules of Criminal Procedure linking the venue of a criminal action to contacts with the defendant, does not mandate a reading of Rule 4 as limiting personal jurisdiction to federal districts with which the defendant has sufficient contacts.

### 4. *Nippon's contacts with the United States*

 Disposition of the present motion depends, then, on whether Nippon has sufficient contacts with the United States to fall within the court's general or specific jurisdiction.

Since its inception in 1993, Nippon has maintained two offices in Seattle, Washington that Jujo previously operated. These offices are staffed by eight employees. One of these offices engages in market research and quality inspections, as well as arranging for the annual transportation to Japan of over $270 million worth of newsprint, publishing paper, and wood chips purchased by Nippon in the United States. Nippon's other Seattle office negotiates contracts for and purchases annually approximately $40 million in logs and lumber from suppliers in the United States for export to Nippon's production facilities in Japan. The Seattle offices maintain bank accounts in the United States through which Nippon pays for purchases of materials exported to Japan, employee salaries, and office expenses.

Additionally, Nippon owns twenty percent of North Pacific Paper Corporation, Inc. ("NORPAC"), a paper manufacturing corporation located in Longview, Washington. NORPAC generates annual revenues of approximately $350 million.

Finally, Nippon officers and directors routinely travel to the United States to conduct business with its suppliers in the United States, to oversee operations of NORPAC, to attend industry conferences, and to negotiate technological agreements.

In light of these contacts, the court concludes that Nippon has engaged in continuous and systemic activity in the United States. Accordingly, the court possesses general personal jurisdiction over Nippon.

### B. *Extraterritorial Application of Section 1 of the Sherman Act*

The court now turns to Nippon's motion to dismiss the indictment for failure to state an action under section 1 of the Sherman Act. Nippon maintains that the indictment charges Nippon, as Jujo's successor, with entering into a horizontal agreement with Japanese manufacturers to fix prices, with selling fax paper to Japanese trading houses in Japan at that price, and directing the Japanese trading houses to resale the fax paper at certain prices. On this characterization of the indictment, the criminal conduct alleged occurred wholly in Japan and was wholly committed by Japanese manufacturers of fax paper. Nippon contends the criminal provisions of the Sherman Act do not apply to conduct wholly occurring outside the United States.

The government responds in two ways. First, it maintains that the indictment alleges

---

4. The court notes that some courts have suggested that due process may protect against abusive selection of a venue by the federal government. *See Petition of Provoo*, 17 F.R.D. 183 (D.Md.),

*aff'd*, 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955). There is, however, no suggestion in this case that the prosecution has acted in bad faith in selecting the present forum.

that the Japanese trading companies and their American subsidiaries joined Jujo in the conspiracy by entering into a vertical agreement to fix the resale price of fax paper in the United States. As such, the government suggests that Nippon's characterization of the indictment as attempting to reach acts solely occurring outside the United States goes awry. Alternatively, the government contends that the criminal provisions of the Sherman Act can reach wholly foreign acts where the intent and effect of those acts is to affect commerce in the United States.

To resolve this motion, then, the court must address two questions: (1) whether the government has sufficiently pled its claim that a vertical agreement existed between Jujo and the trading houses; and (2) if not, whether the Sherman Act reaches the alleged horizontal agreement between Jujo and the other Japanese manufacturers of fax paper.

### 1. *Adequacy of pleading the vertical agreement*

■ An indictment must contain essential facts constituting an offense charged and must set forth every essential element of an alleged offense. Fed.R.Crim.Pro. Rule 7(c)(1). *See, e.g., United States v. McDonough*, 959 F.2d 1137, 1140 (1st Cir.1992). The essential elements of a Sherman Act indictment are the time, place, manner, means, and effect of an alleged violation. *United States v. Tedesco*, 441 F.Supp. 1336, 1339 (M.D.Pa.1977).

■ In *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Supreme Court propounded the evidentiary requirements of proving a vertical agreement to fix resale prices. Compliance by a distributor with a manufacturer's unilateral directive to resell its product at a certain price does not constitute an agreement to conspire on the part of the distributor. *Id.* at 764, 104 S.Ct. at 1470. The evidence regarding the action of the distributor, therefore, must be of a nature that excludes the possibility the manufacturer and distributor were acting independently. *Id.* at 764, 104 S.Ct. at 1470. Indeed, the evidence must demonstrate that the manu-

facturer and distributor " 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Id.* So, for example, neither the fact that a manufacturer has directed a retailer to sell at a certain price and the distributor complies with that direction, nor the fact that the retailer exchanges sales information with the manufacturer, support an inference of a vertical price-fixing scheme. *Id.* at 762–64, 104 S.Ct. at 1470–71.

■ *Monsanto*'s articulation of what conduct may permissibly give rise to an inference of an agreement is germane to whether the indictment adequately describes the existence of a conspiracy between trading houses and Jujo. In making that determination, the court looks for either an allegation that an express agreement was entered into between Jujo and the trading houses, or a description of alleged conduct from which the reader could infer such an agreement. For the reasons that follow, the court concludes that the indictment fails to adequately plead the existence, manner, and means of a vertical price fixing agreement between Jujo and the Japanese trading companies.

As an initial matter, the court observes that the indictment does adequately aver that, at meetings in early 1990, Jujo and co-conspirators explicitly agreed to price increases in fax paper. Indictment ¶ 7(b). The government concedes, however, that it is not proceeding under the theory that the Japanese trading companies attended the meetings at which this alleged explicit agreement was formed. Transcript of July 29, 1996 Hearing at 23.

Apart from the specific allegation that an agreement was reached at the early 1990 meetings, there is no other language in the indictment indicating that a subsequent vertical agreement arose between Jujo and the Japanese trading houses. In paragraphs 7(d) and 7(e), the indictment states that Jujo "directed the co-conspirator trading houses to implement price increases to fax paper customers in North America" and "participated in telephone conversations and otherwise contacted each other to maintain con-

tinued adherence to their conspiratorial agreement." This completes the indictment's characterization of the means and method of the conspiracy. Neither direction by Jujo to the trading houses nor communication by Jujo to determine compliance with that direction, imply the existence of a vertical agreement between Jujo and the trading houses.

Examining the indictment's description of the effects of the alleged conspiracy yields even less indication that a vertical agreement is alleged. Paragraph 9 of the indictment reads: "[t]he Japanese manufacturers sold discrete quantities of fax paper to the trading houses in Japan, for specific customers in North America, on condition that such quantities be sold to customers at specified prices." It continues: "[t]he Japanese manufacturers ... monitored the trading houses' transactions with the North American customers to ensure that the agreed upon prices were charged." Again, these averments merely suggest that, to ensure the success of its horizontal agreement, Jujo undertook to direct the trading houses to sell fax paper at a specified price and to monitor whether the trading houses were complying with this directive. Neither of these allegations serve as an averment that the trading houses entered into a price fixing agreement with Jujo.

In sum, except for the naked characterization of the trading houses as co-conspirators, the indictment merely alleges: (1) that Jujo directed the trading houses, (2) that Jujo communicated with the trading houses, and (3) that the trading houses served as the distributive link between Jujo and purchasers of fax paper in the United States. This court concludes that such allegations, singly or in combination, do not satisfy the government's burden of pleading with requisite particularity the existence of a vertical agreement.

### 2. *The horizontal agreement*

■ Because the government has failed to plead a vertical agreement to join the conspiracy by the trading houses, this case does not involve overt acts by co-conspirators occurring in the United States. The government contends, nonetheless, that the Sherman Act encompasses the wholly extraterritorial conduct described in the alleged horizontal agreement between Jujo and the other Japanese manufacturers of fax paper. This presents a question of first impression regarding the extraterritorial reach of the criminal provisions of the Sherman Act. *See* Restatement (Third) of Foreign Relations Law § 403, note 8 (1986) ("No case is known of criminal prosecution in the United States for an economic offense (not involving fraud) carried out by an alien wholly outside the United States.").[5]

Section 1 of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C.A. § 1. This section serves as the substantive language for both civil and criminal application of the antitrust laws. According to the government this essentially ends the matter, for "it is well established that [the civil sanctions of] the Sherman Act appl[y] to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 795, 113 S.Ct. 2891, 2908, 125 L.Ed.2d 612 (1993). The court, however, disagrees with that suggested equating of the Sherman Act's civil and criminal application.

---

5. The government cites two criminal cases as applying the Sherman Act to foreign conduct: *United States v. R.P. Oldham Co.*, 152 F.Supp. 818, 822 (N.D.Cal.1957) and *In re Grand Jury Investigation of the Shipping Industry*, 186 F.Supp. 298, 313 (D.D.C.1960). Both of these cases, however, specifically premise their holding on the fact that co-conspirators committed overt acts in the United States. *Oldham*, 152 F.Supp. at 821 ("the only commerce sought to be regulated is the importation and sale of wire nails on the West Coast of the United States"); *Shipping Industry*, 186 F.Supp. at 314 ("*American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), does not preclude Sherman Act jurisdiction over agreements in restraint of trade carried out, at least in part, within the United States."). Indeed, *Oldham* makes "clear that there is no attempt here to regulate Japanese commerce as such, or to indict Japanese firms or Japanese nationals." *Oldham*, 152 F.Supp. at 821.

■ As a general matter, there is a strong presumption against extraterritorial application of federal statutes, absent a clear expression by Congress to the contrary. *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991). As noted above, courts have held that this presumption has been overcome in the case of civil application of the federal antitrust laws. *Hartford*, 509 U.S. at 795, 113 S.Ct. at 2908. Nonetheless, because the presumption carries even more weight when applied to criminal statutes, *United States v. Bowman*, 260 U.S. 94, 97–98, 43 S.Ct. 39, 40–41, 67 L.Ed. 149 (1922), the line of cases permitting extraterritorial reach in civil actions is not controlling. And, indeed, commentators have generally recognized this distinction when explaining the extraterritorial reach of the antitrust laws:

> The principles governing [extraterritorial application of civil laws] apply to criminal as well as civil litigation. However, in the case of regulatory statutes that may give rise to both civil and criminal liability, such as United States antitrust and securities laws, the presence of substantial foreign elements will ordinarily weigh against application of criminal law. In such cases, legislative intent to subject conduct outside the state's territory to its criminal law should be found only on the basis of express statement or clear implication.

Restatement (Third) of Foreign Relations Law § 403, cmt. f (1986).

Moreover, courts have recognized that the substantive language of section 1 of the Sherman Act requires different treatment in civil and criminal contexts. *See, e.g., United States v. United States Gypsum Co.*, 438 U.S. 422, 439–43, 98 S.Ct. 2864, 2874–77, 57 L.Ed.2d 854 (1978) ("*Gypsum*"). In *Gypsum*, the Supreme Court confronted the issue of whether criminal responsibility under the Sherman Act should be based on strict liability, as it had been held in civil cases, or whether some intent element should be attributed to it as the traditional canons of statutory interpretation would suggest. *Id.* at 436, 98 S.Ct. at 2873. The Court reasoned that the ambiguities inherent in the fact intensive nature of an antitrust prosecution counseled against imposing criminal liability absent a demonstration of intent to violate the law. *Id.* at 440–42, 98 S.Ct. at 2875–76. Additionally, the Court recognized that Congress adopted the language of the Sherman Act "fully aware of the traditional distinction between the elements of civil and criminal offenses and apparently did not intend to do away with them." *Id.* at 443 n. 19, 98 S.Ct. at 2876 n. 19.

Here, the court faces a choice between competing interpretative principles similar to the one posed in *Gypsum*. As did the Court in *Gypsum*, this court concludes that the traditional distinction between the elements of civil and criminal charges must be maintained.

This conclusion finds support in policies underlying antitrust and criminal law. On the civil side, antitrust enforcement benefits from a certain degree of interpretive flexibility. *Appalachian Coals v. United States*, 288 U.S. 344, 359–60, 53 S.Ct. 471, 473–74, 77 L.Ed. 825 (1933). That flexibility enables the government to use the antitrust laws as an effective means for regulating business practices. *Cf. Gypsum*, 438 U.S. at 442, 98 S.Ct. at 2876. But, as Nippon observes, such flexibility is antithetical to the principles of predictability and fairness that undergird the criminal law. *Id.* at 441–42, 98 S.Ct. at 2875–76. *See also* 2 Areeda and Hovenkamp, *Antitrust Law* § 311 32–33 (rev. ed. 1995). And, because the Sherman Act is silent on the issue, imputation of extraterritorial application of its provisions would present serious questions about notice to foreign corporate defendants as to the criminality of its conduct. *Cf. Balthazar v. Superior Court of the Commonwealth of Massachusetts*, 428 F.Supp. 425, 433 (D.Mass.1977) ("criminal liability should only attach to clearly delineated transgressions"), *aff'd*, 573 F.2d 698 (1st Cir. 1978).

In addition, the legislative history belies any suggestion that, in passing the Sherman Act, Congress believed that it was reaching wholly extraterritorial conduct. In response to concerns that potential antitrust violators could evade the proscriptions of the Sherman Act by forming their agreement outside the United States, Senator Sherman explained:

It is true that if a crime is committed outside of the United States it can not be punished in the United States. But if an unlawful combination is made outside of the United States and in pursuance of it property is brought within the United States such property is subject to our laws. It may be seized. A civil remedy by attachment could be had. Any person interested in the United States could be made a party.

Either a foreigner or a native may escape "the criminal part of the law," as he says, by staying out of our jurisdiction, as very many do, but if they have property here it is subject to civil process.... [A foreigner] may combine or conspire to his heart's content if none of his co-conspirators are here or his property is not here.

21 Cong.Rec. 2461, *reprinted in* Earl W. Kintner, ed., *The Legislative History of Federal Antitrust Laws and Related Statutes,* Part I, *The Antitrust Laws,* vol. 1. p. 126 (1978).

For all these reasons, the court concludes that the criminal provisions of the Sherman Act do not apply to conspiratorial conduct in which none of the overt acts of the conspiracy take place in the United States.

The indictment against Nippon and Jujo will be dismissed.[6]

---

**6.** Because Jujo no longer exists, the court considers Nippon's motion for dismissal as made on behalf of both defendants named in Count I of the Indictment. Accordingly, dismissal of the indictment will enter as to both Nippon and Jujo.