**UNITED STATES of America,
Plaintiff,**

v.

**NIPPON PAPER INDUSTRIES CO.,
LTD., formerly Jujo Paper Co.,
Ltd., Defendant.**

**Cr. No. 95–10388–NG.**

United States District Court,
D. Massachusetts.

July 16, 1999.

---

9. The defendant's status in *Bartlett Tree* never changed from that of a permanent employee.

Alan M. Cohen, O'Melveny & Myers, New York City, Ian Simmons, Jeffery W. Kilduff, O'Melveny & Myers, Washington, DC, William H. Kettlewell, Dwyer & Collora, Boston, for Nippon Paper Industries Co., Ltd., for Defendants.

Lisa M. Phelan, U.S. Department of Justice, Washington, DC, for U.S.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

TABLE OF CONTENTS
MEMORANDUM AND ORDER
July 16, 1999

I. PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

II. RULE 29 STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

III. EVALUATING THE MERITS OF A PRICE–FIXING CLAIM . . . . . . . . . . . . . . . . . 179

IV. THE FACTS ADDUCED AT TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180
 A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180
 B. Co–Conspirator Hearsay and Cultural Inferences . . . . . . . . . . . . . . . . . . . . . . . 182
 C. Failure to Present Sufficient Evidence of a Conspiracy Continuing
 Through November 15, 1990, of Which Jujo/NPI Was a Member . . . . . 184
 1. Evidence of a March 1990 Conspiracy to Fix Prices . . . . . . . . . . . . . . . . . . . . 184

2. Evidence that Jujo Was a Member of a Price–Fixing Conspiracy .........188
3. Evidence that the Conspiracy Had Dissolved Before the Limitations Period ........................................................189
D. Failure to Present Sufficient Evidence that Any Continuing Conspiracy Had Substantial Effects.........................................192

V. CONCLUSION ................................................196

This case, in its journey to and from the Court of Appeals, and in the trial before me, has raised important questions concerning the extraterritorial application of American criminal antitrust laws to a foreign corporation. The United States indicted a Japanese corporation, Nippon Paper Industries Co., Ltd. ("NPI"), alleging that NPI's predecessor, Jujo Paper Company, Ltd. ("Jujo"), conspired with other Japanese manufacturers to fix the price of thermal fax paper for export into the United States in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

The charges were first dismissed by the trial court,[1] reinstated by the First Circuit,[2] then tried before me for over six weeks.[3] While the basic jurisdictional issue—whether criminal antitrust charges could be lodged against a Japanese corporation based on the facts as alleged—was resolved by the First Circuit's decision, the trial of the matter proved complex and troubling. Ultimately, after more than six days of deliberation, the jury was unable to come to a decision.[4]

NPI renewed its motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29 (docket # 260). After review of the entire record of the trial, the exhibits, and lengthy memoranda, I GRANT the motion and hereby direct a verdict of acquittal.

## I. *PROCEDURAL HISTORY*

On December 13, 1995, a federal grand jury in Boston returned an indictment against Jujo, and NPI, as Jujo's successor.

Jujo/NPI was charged in one count of price-fixing. The allegations were that beginning at least as early as February 1990 and continuing at least through December 1990, NPI and its co-conspirators participated in a price-fixing conspiracy involving the sale of thermal facsimile paper ("fax paper") sold in the United States and Canada ("North America").

NPI moved to dismiss. It alleged that if the conduct occurred at all, it took place entirely in Japan and as such American criminal antitrust laws could not be extraterritorially applied. The government contested both NPI's characterization of the facts—that the conduct at issue took place completely within Japan—and its characterization of the law—the limited nature of American jurisdiction. The government maintained that the case involved a horizontal conspiracy amongst NPI and other manufacturers which it conceded took place on Japanese soil, and, in effect, a vertical conspiracy between those manufacturers and the trading houses which sold their product on American soil. The Japanese conspiracy alone, the government maintained, was supportable under *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), because of its intended and likely impact on American trade. The allegations that United States trading houses took steps to implement the scheme vitiated any concern about the extraterritorial application of American law.

1. *United States v. Nippon Paper Indus. Co.,* 944 F.Supp. 55 (D.Mass.1996).

2. *United States v. Nippon Paper Indus. Co.,* 109 F.3d 1 (1st Cir.1997).

3. The trial started on June 1, 1998, and after twenty-six trial days, a mistrial was declared on July 13, 1998.

4. Jury deliberations started on July 1, 1998, and on July 13, 1998, a mistrial was declared.

The District Court dismissed. As to the allegation of illegal conduct within the United States, the Court held that the government failed to adequately plead a vertical conspiracy between American trading houses and the Japanese manufacturers with whom they were affiliated. *See United States v. Nippon Paper Indus. Co.*, 944 F.Supp. 55, 63 (D.Mass.1996). As to the actions of the Japanese manufacturers, the Court dismissed the indictment on the ground that a criminal antitrust prosecution could not be based on wholly extraterritorial conduct. *See Id.* at 66.[5]

The First Circuit reversed. In a case of first impression, the court held that the Sherman Act, previously given extraterritorial application only in civil cases, had equal breadth in a criminal case. *See United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 4 (1st Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). Rejecting arguments derived from comity among nations, as well as those hinging on differences between civil and criminal law, the Court found that *Hartford Fire* "definitively establishe[d]" that American antitrust laws apply to "wholly foreign conduct which has an intended and substantial effect in the United States." *Id.* at 9.

The case was reassigned to this Court. While concerns about comity and the exigencies of a criminal prosecution may not have been sufficient to bar the prosecution, they figured prominently in the actual trial. Fundamental issues about language and meaning—which inferences were reasonable and which were not in light of Japanese culture and traditions—permeated the case. In short order, the Court was obliged to address: To what degree does the international nature of the investigation affect the discovery obligations of the United States Government? (Memorandum and Order, May 15, 1998) Which country's law governs the question of the liability of a successor corporation?[6] (Order, May 29, 1998) Should the Court allow the video teleconferencing of a witness from Japan in the middle of the trial when that witness was beyond government process? (Memorandum and Order, July 28, 1998) What procedures should the Court follow when the translator for the defense and the translator for the government disagree on a critical issue (whether the word "Sando" meant agreement, which was illegal, or concurrence, which, arguably, was not)? Should the Court permit the introduction of evidence of price-fixing involving products to be sent to other countries when such activities were not illegal in those countries?

In its original and renewed motions for acquittal, NPI claims that there was no evidence that a conspiracy to set prices existed, or that its predecessor, Jujo, knowingly joined it. It also claims that even if one were to credit the evidence that Jujo was a member of a price-fixing conspiracy, the evidence is clear that it was not a member of any such conspiracy by the time the limitations period began, that is after November 15, 1990.[7]

In addition, NPI would have the Court reexamine jurisdiction, now in the light of

---

**5.** A horizontal conspiracy is one that involves defendants in a given market, at the same level of distribution. *See United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). By contrast, a vertical conspiracy is an agreement between defendants at different levels of distribution. *See Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Such conspiracies typically involve a manufacturer or supplier dictating the resale price of an item it sold to its distributor or to other customers.

**6.** The government sought to hold NPI responsible for the acts of its predecessor company, Jujo. I treated the issue as a choice of law question and concluded that Japanese law was not inconsistent with holding NPI responsible as a successor. *See* Memorandum and Order, dated May 29, 1998.

**7.** The indictment in this case was handed down on December 13, 1990, but NPI agrees with the government that the relevant date for the statutory period is November 15, 1990.

the facts adduced at trial. The First Circuit, it argues, in reinstating this indictment, set a standard for a foreign antitrust conspiracy—even one allegedly involved in price-fixing—that was different from the domestic one, requiring, in addition to the traditional factors, a showing of "conduct which has an intended and substantial effect in the United States." *Nippon*, 109 F.3d at 9. While the facts *as alleged* in the indictment may have passed muster, the facts *as proved* did not. Moreover, NPI argues even if the conspiracy's contacts with the United States were at some point sufficient to meet a "substantial effects" test, the Japanese manufacturers' complete loss of market share meant that no substantial effects continued into the limitation period.

NPI's renewed motion for judgment of acquittal pursuant to Rule 29 is ALLOWED.

## II. *RULE 29 STANDARD*

■■■ A motion under Fed.R.Crim. Proc. Rule 29 should be granted only where the evidence adduced at trial is so insufficient that no rational trier of fact can find proof beyond a reasonable doubt.[8] To be sure, this is a very heavy burden. The Court must give the prosecution the benefit of all reasonable inferences drawn from the evidence, including circumstantial evidence, "and the trial court is required to view the evidence in the light most favorable to the Government with respect to each offense." *United States v. Mariani*, 725 F.2d 862, 865 (2nd Cir.1984). The Court may not weigh the evidence. *See United States v. Arache*, 946 F.2d 129, 139 (1st Cir.1991) ("credibility of witnesses

[can] not be assessed in determining the sufficiency of the government's evidence.").

But the Court can determine whether the inferences that the government asks the jury to draw are reasonable, or rather inappropriately "piling inference upon inference." *United States v. DeLutis*, 722 F.2d 902, 907 (1st Cir.1983). Thus, a reviewing court must "take a hard look at the record and [reject] those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative. This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt." *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir.1995).

## III. *EVALUATING THE MERITS OF A PRICE–FIXING CLAIM*

■■■ Section One of the Sherman Act reads: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the Several States, or with foreign nations, is illegal." 15 U.S.C. § 1. In a price-fixing case, the government must prove three elements: (1) that the conspiracy to fix prices described in the indictment was knowingly formed and existed at or about the time alleged in the indictment; (2) that the defendant, NPI, through its predecessor, Jujo, knowingly became a member of the conspiracy to fix prices;[9] and (3) that the conspiracy had an intended and substantial effect on commerce in the United States.[10] Moreover, all of the relevant factual conditions—existence of the conspiracy, Jujo/NPI's membership in it, and the conspiracy's having intended and substantial effects on commerce in the United

---

**8.** Rule 29(a) provides that "[t]he court on motion of the defendant or of its own motion shall order the entry of judgment of acquittal . . . after the evidence on either side is closed if the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a).

**9.** *See United States v. All Star Industries*, 962 F.2d 465, 474 (5th Cir.1992) (in a *per se*

violation case, the government has the burden to prove "that defendants knowingly and intentionally joined that agreement").

**10.** *See Nippon*, 109 F.3d. at 9 (holding "that Section One of the Sherman Act applies to wholly foreign conduct which has an intended and substantial effect in the United States.").

States—must have existed at the time the limitation period began, November 15, 1990.

The government has failed on all three elements to show that "a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Curley v. United States*, 160 F.2d 229, 232 (D.C.Cir.1947) (cited in 2 Charles A. Wright, Federal Practice and Procedure § 467 (1982 and Supp.1999)). The problem with regard to the first two elements is the same: Even if the government was able to show that a conspiracy to fix prices existed at one time, and included Jujo/NPI, it was unable to demonstrate to any rational trier of fact beyond a reasonable doubt that the conspiracy continued through November 15, 1990. And, with regard to the third element, the government did not present sufficient evidence that the conspiracy, even if it continued to exist on November 15, 1990, still had a substantial effect on commerce in the United States at that time.

## IV. *THE FACTS ADDUCED AT TRIAL*

### A. *Background*

█ The centerpiece of the government's case was a meeting that was held on March 30, 1990, attended by representatives of ten paper companies that manufacture thermal fax paper imported into the United States. They included Kanzaki Paper Manufacturing Co. Ltd. ("KSK"), Mitsubishi Paper Mills ("MPM"), Oji Paper Company ("Oji"), Honshu Paper Company ("Honshu") and Jujo/NPI. The

meeting had been called to deal with a threat by an American paper company to charge these Japanese manufacturers with "dumping" paper in the American market, or selling their products at a price below their fair value to the detriment of a domestic industry.[11]

The Japanese manufacturers made up perhaps thirty percent of the market for thermal fax paper; the American companies, seventy percent. Virtually all witnesses agreed that throughout 1990 there was a substantial downward pressure on prices because of an oversupply of thermal fax paper. Indeed, the entire product line was facing strong competition from "plain paper" fax machines.

The stakes were high: If the dumping charges were proved, the imports of the offending companies would be subject to a tariff. Given the size of their market share, the weakness of the product, and the oversupply of thermal fax paper—any tariff increasing the cost of thermal fax paper would likely drive these companies out of the American market. They had to walk a fine line—raising prices to avoid a dumping charge, without going so far as to eliminate their market share entirely.[12]

█ Manufacturers can lawfully meet to discuss common concerns. Indeed, they can discuss market conditions, and even prices. *See Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 763, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). They can choose to concur in the pricing decisions of others so long as they independently arrive at these decisions. *Id.* What they

11. *See* 19 U.S.C. § 1673. Dumping is determined by evaluating the price charged in the United States with the price in the home market, suitably adjusting for "costs, charges, and expenses incurred as a result of exporting the goods from the home country to the United States." *NSK Ltd. v. United States,* 115 F.3d 965, 969 (Fed.Cir.1997).

12. There was the aroma of a setup in all of this by the American companies seeking not just to eliminate their Japanese rival's competitive edge, but to eliminate their Japanese rivals entirely. One of the attendees at the

March 30, 1990, meeting, KSK, was the parent company of Kanzaki Specialty Papers (KSP), an American company. (KSP was considered to be an American corporation for anti-dumping purposes.) Hirosuke Fukuda, a KSP vice president, testified that he used KSK to get information about Japanese prices; KSK in turn directed its American company, KSP, to join with Appleton and threaten to file an anti-dumping petition. That, in turn, would force the Japanese companies to raise their prices and push them out of the market.

may not lawfully do is to agree to fix the prices that they will charge in the American market. And that, the government alleged, is just what they did: The Japanese companies illegally agreed to raise the price at which they sold thermal fax paper to $20.00 per hundred square meters.

Implementation, however, was not easy. None of these manufacturing companies had sales divisions in the United States charged with importing the product. Each manufacturer would sell the paper outright to a Japanese trading company. The Japanese trading company, after marking up the product, would then sell it outright to a trading company on United States soil. The United States trading companies, after adding their own markups, would sell the product to converters, companies that would convert the thermal fax rolls into the particular sizes the customers ordered.

However complicated the implementation, the government proved overt acts in furtherance of the agreement—that some of the conspirators told their affiliated trading houses about the manufacturer's March meeting, directed them to raise the prices, and that some of the trading houses took steps to carry out the increase, at least initially.

To be sure, some trading companies strongly resisted any price increases, arguing with the manufacturer's representatives, perhaps even refusing to implement it,[13] or cutting special deals with customers to mitigate its effects. Indeed, by the end of the trial, the government was obliged to change its theory from price-*fixing* to price *stabilization*.[14] But the complexities of implementation according to the government were not critical to their case. A price-fixing agreement, it noted, does not have to be successful to be illegal.

The defense agrees that a meeting was held, agrees that it was in response to an anti-dumping threat, but contends that the meeting was on the permissible side of the line—Japanese manufacturers meeting to discuss a common legal threat. Nothing nefarious was intended; nothing nefarious was accomplished. Documents which it highlighted suggested that the government's characterization of the March 30 meeting was wrong. Some participants had either second thoughts immediately about price increases or no intention of ever going along with it. Some documents suggested that the March 30 meeting was

13. For example, Mr. Ito of MIC (the American trading house) writes to MC (the Japanese trading house) in June of 1990: "Under the current environment, for whatever reasons' this is not a market under which we can accept a price increase. I also don't think there would be a general price increase with the concern for dumping as Mitsubishi explains. If Mitsubishi needed to raise prices somehow (for public consumption) because of dumping, they can find a technical solution that would keep the actual prices with no change ..."

"Either way, under the current circumstances I have to say that an actual price increase is impossible, and accordingly we must use an actual price <support> measure for at least the July production (if necessary I will consent to a separate public pricing). For August and beyond I would like to meet with Ichida Department Chief [from the manufacturer, Mitsubishi Paper Mills] when he visits the US. Please confirm." Another official of a trading company, Mr. McCall of DaiEi Papers U.S.A., distributor of Honshu products, peppered the manufacturers with letters and faxes urging them not to raise prices because of the market conditions.

14. NPI claimed that this change represented a material variance between the government's price-fixing indictment, and its price stabilization proof, and moved for a mistrial. While I denied the motion, on reflection I believe the ruling was in error. The indictment suggested a simple theory—an agreement to increase prices and its implementation. Even the government's opening reflected this approach. The defense defended, in part, on the grounds that many prices in fact *declined* after the March 30 meeting. A price stabilization theory concedes that, but suggests that prices would have declined more had there been no agreement. In the light of that issue, one can envision a different defense—significantly with expert witnesses, perhaps different cross examination. The issue, however, is mooted by the instant order.

"all talk." They all had to make noises about price increases to deflect the antidumping threat; what they planned to do, however, was another matter.

Indeed, according to the defense, one indication of the innocuous nature of the March 30 meeting was the patchwork quilt of prices that resulted. There were no across-the-board increases; most prices continued to decline. In any event, there was no evidence of Jujo's participation. In a time line presented to the jury, NPI attempted to show that after each critical price-fixing event alleged by the government, Jujo *lowered* its prices. Whatever public face Jujo may have presented to other Japanese competitors was belied by its actions.

Finally, by November 15, 1990, the government can show neither the continuation of the conspiracy nor its continued "substantial effect" on American commerce. Oversupply of thermal fax paper, the pressures driving down prices, coupled with the strength of the American competitors create a paradox in the core of the government's case: If there had been a conspiracy to fix prices in March of 1990, and prices were raised or even stabilized, that conspirator would immediately lose customers, market share and in short order, any impact on the American market. If, recognizing that, a conspirator jumped ship at the first opportunity, abandoning all efforts to increase or stabilize prices, then it would have abandoned the conspiracy.

Indeed, the record reflects that *both* happened. Some companies, like Honshu, may well have tried to raise prices or at least hold the line. By November of 1990—they lost substantial numbers of their American customers. Others, like Jujo and Oji, continued to lower prices—ignoring whatever representations they had made in March. By mid 1990 a price competition resumed—as to those still in the market—that was so vigorous that the American companies threatened a dumping charge again.

## B. *Co–Conspirator Hearsay and Cultural Inferences*

The evidence on which the government chiefly relied consisted of documents, business records and testimony by coconspirators—representatives of other Japanese manufacturers it contended conspired to fix prices, employees of the trading companies who distributed the product between Japan and the United States, and within the States, who allegedly implemented the price plan.

■ NPI vigorously challenged the testimony under F.R.E. Rule 801(d)(2)(E), claiming that there was inadequate independent evidence to show that these were statements made by co-conspirators "during the course and in furtherance of the conspiracy." While the Court could weigh the statements themselves in making threshold determinations under the Rule, *see Bourjaily v. United States,* 483 U.S. 171, 180–81, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), those statements alone are not sufficient, absent independent evidence. *See United States v. Sepulveda,* 15 F.3d 1161, 1181–82 (1st Cir.1993); *United States v. Petrozziello,* 548 F.2d 20 (1st Cir.1977). On a preliminary showing by the government, the statements were admitted *de bene. See United States v. Ciampaglia,* 628 F.2d 632, 638 (1st Cir.1980).

The enterprise of making findings under *Petrozziello,* as well as making findings under Rule 29, was complicated by the cultural/language divide in this case. There were warring translations of documents and testimony, and warring views of the inferences that could reasonably be drawn from certain acts and statements. NPI attempted to show that acts that may appear nefarious to American eyes, had no such patina in Japan.[15] Where the con-

---

**15.** It is commonplace to talk about how fact finders are asked to draw reasonable infer-

ences from the evidence based on their "shared perceptions" and their common un-

tested issues involved language, the translators were urged to resolve their differences; where they could not, the jury was given the evidence of both translations.[16]

■ Understanding full well the problem of bootstrapping—weighing too heavily the contested statements themselves, all

the while trying to determine if they are admissible—as well as the problems raised by language, I nevertheless concluded that the statements had been appropriately admitted.[17] But considering all of the evidence, co-conspirator hearsay and otherwise, the government's case faltered.

derstanding of the "habits, practices, and inclinations of human beings." *United States v. Ortiz,* 966 F.2d 707, 712 (1st Cir.1992). Here American "shared perceptions" and the common understandings of the significance of particular acts may well be at odds with the meaning given those acts in Japan. To the extent that this was so, it was incumbent upon NPI to present evidence to that effect to the jury.

16. A government witness, Andy McCall of DaiEi, testified that in Japanese, "[s]entences often don't have a subject, but at the beginning [of the text] the subject is identified, and then in subsequent sentences ... the subject would not be repeated." An interpreter would be obliged to infer who the subject is. Moreover, he noted that Japanese history is "longer than our history is. So there's some shared values that the Japanese have and are understood through history, culture and language." Sometimes those values are implied, "written between the lines," and can be difficult to understand for a non-native.

17. The defense insisted that the co-conspirators under the rule had to be either named in the indictment, or had to have qualified for that designation under the substantive law of conspiracy. Since the Japanese trading houses would not have qualified under *Monsanto Company v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), NPI argues, the statements and faxes from these companies must be excluded.

The law with respect to co-conspirator hearsay, however, is not coterminous with the substantive criminal law. *See United States v. Carter* 966 F.Supp. 336, 346 (E.D.Pa.1997). Under the circumstances, I found that there was sufficient evidence to meet the *Petrozziello* standard: Many of the documents which tended to prove the existence of a conspiracy had an independent non hearsay basis—records of regularly conducted activity under F.R.E. Rule 803(6), or statements against interest under F.R.E. Rule 806(b)(3). These included the critical memoranda with respect to the March 30, 1990, meeting of the alleged co-conspirators, as well as documents sug-

gesting price increases to at least certain Jujo customers.

In addition, there was testimony concerning non-assertive conduct, notably the presence of a Jujo representative at crucial meetings in February and March, who, according to Mr. Hinoki, made no objections to what was being said. In some instances, the contested co-conspirator statement was not offered for its truth at all. In order to rebut NPI's claim that the prices charged in the United States were the product of independent negotiating between customers and trading houses, and trading houses and the manufacturers, rather than the manufacturers' orders, the government sought to introduce the fact that efforts to increase prices in some instances followed a communication with the manufacturer or Japanese trading house alerting the American trading companies to the March 30 agreement. Moreover, it was significant that these statements—offered de bene or for a non hearsay statement—corroborated each other as I noted: "[W]here there are 15 statements from independent co-conspirators[,][o]ne argument is that the facial consistency of all the co-conspirators' statements is independent evidence." *See United States v. Garner,* 837 F.2d 1404, 1415 (7th Cir.1987) ("The remarkable consistency with which payments were made [to inspectors] and the fact that the inspectors raised the standard fee almost simultaneously from $10 to $20 suggests that the inspectors were communicating with each other and encouraging each other to raise the fee.") In this regard, I am not specifically weighing the content of the statements—only that they are consistent with each other.

Where the standard for proving the existence of a conspiracy and the defendant's participation in it is by a preponderance of the evidence, I concluded that the evidence was sufficient. Where the standard is more rigorous, and where the evidence concerns the continuation of that conspiracy into the fall of 1990, I have come to a different conclusion.

### C. Failure to Present Sufficient Evidence of a Conspiracy Continuing Through November 15, 1990, of Which Jujo/NPI Was a Member

#### 1. Evidence of a March 1990 Conspiracy to Fix Prices

The government's most important evidence consists of a single document, a "Report on Thermal Paper Export Manufacturer's Meeting." The report was prepared by Mr. Funabashi of Honshu, a thermal fax paper manufacturer and one of the attendees of the March 30, 1990 meeting. Written the next morning, it described who attended: Honshu, KSK, MPM, Oji, and Jujo along with five other companies. According to the government's translation, the document states that "agreement and approval was obtained from each company to revise prices as given below." The new price for the North American market was to be $20.00/100m2, to be implemented in May 1990. This was the government's smoking gun.

The government buttressed the document through the testimony of other "downstream" witnesses—the employees of Japanese and American trading companies "ordered" to implement a price increase, the telexes and faxes between those trading companies, and other messages sent between manufacturers and the trading companies.

■ NPI responds that the government's evidence is insufficient for several reasons. First, Mr. Funabashi's report is squarely contradicted by the only testimony offered at trial of someone present at that meeting. Mr. Hinoki, also of Honshu, who was the government's star witness,[18] denied that any of the manufacturers at that meeting agreed either to increase or to stabilize prices, and indeed, did not recall what if anything was said about price increases in the United States.[19]

· Second, there is no evidence, according to NPI, that the meeting consisted of anything other than mid-to-lower level employees who discussed, without the authority to bind their respective companies, the threat of an anti-dumping action by competitors in the U.S. Indeed, Mr. Hinoki testified not only that there was no agreement, but that he himself lacked ultimate price authority to bind Honshu. NPI argues that there is no reason to think any of the other attendees had any more authority than he.

Third, NPI contests the translation of the word "Sando" in Mr. Funabashi's report of the March 30, 1990, meeting. According to the government, "Sando" means "agreement"; according to NPI, it means "concurrence." While NPI acknowledges that "agreeing" to revise prices at a certain level would be illegal, it argues that merely concurring with a suggested price

---

**18.** Hinoki's testimony was so important to the government that it sought to take his testimony via video teleconferencing. The testimony was taken each evening at 6:00 p.m. Boston time, and 7:00 a.m. Tokyo time. See Memorandum and Order, July 28, 1998.

**19.** The government improperly sought to impeach Mr. Hinoki, its own witness, by suggesting that he had earlier given the AUSAs and their paralegals different stories, more favorable to the government. The examination was entirely impermissible. The government refused to allow the defense to use its "rough notes" of its meeting with Mr. Hinoki to cross-examine, but it had no problem using them. The AUSA repeatedly asked Mr. Hinoki questions beginning with, "Didn't you tell me [such and such] when I met with you

…" See United States v. Shoupe, 548 F.2d 636, 643 (6th Cir.1977) (holding that "recitation by the prosecutor of the entire substance of a witness's disavowed, unsworn prior statements, which, if credited by the jury, would be sufficient to sustain a conviction, abridged defendants' right to a fair trial in violation of the Due Process Clause of the 5th Amendment."). See also United States v. Zackson, 12 F.3d 1178, 1185 (2d Cir.1993), cert. denied 512 U.S. 1224, 114 S.Ct. 2717, 129 L.Ed.2d 842 (1994) (excluding testimony of a government witness where the government's proffer indicated that the witness would offer no probative testimony and was using the witness only as a conduit to get potentially prejudicial hearsay before the jury.)

is not. Indeed, it argues that the evidence shows only that someone proposed that a $20.00/100m2 price would be a good countermeasure to the threatened dumping charge; it claims that there is no evidence that any manufacturer actually agreed not to charge below that figure.[20] Indeed, many of the documents suggest that the manufacturers wanted to investigate the matter further before making a decision, consider the market trends, and gauge what other manufacturers were doing. Notwithstanding the tenor of Funabashi's account of the March 30, 1990, meeting, other documents suggested that the participating companies had not, in fact, made up their minds as to the pricing strategy.[21]

Fourth, NPI claims that the record suggests that the companies planned to answer the anti-dumping threat with a response individualized to each customer, rather than with the blanket, across-the-board price increase as alleged in the indictment. In a memorandum that Mr. Hinoki wrote to accompany his transmittal of Mr. Funabashi's report to Honshu's Seattle office, Mr. Hinoki clearly indicated that Honshu itself intended to respond to the dumping threat on a customer-by-customer basis: "Our company is thinking as its response, 'to cooperate with the industry without reducing the amount of orders received,' and [we] would like to plan our responses *according to each customer.*" From this NPI infers that Honshu itself never intended to impose an across-the-board price increase or price stabilization strategy. And if Honshu did not intend either sort of price strategy, there is no reason to think that any others at the meeting did either.[22] Indeed, NPI cross-examined virtually each and every trading house employee by showing that for the most part, prices continued to decline during the relevant period, culminating as I describe, *infra*, in a resumption of competition by mid 1990.

Finally, when the government's theory moved from price-fixing to price stabilization, the evidence was even more tenuous. Given the severe downward pressure on prices, if they stabilized at all during the period immediately following the March 30 meeting—and as I describe there is reasonable doubt that they did for very long—it was *as* likely or *more* likely to have been the result of the serious threat of Appleton's anti-dumping petition as any conspiracy to fix prices. A reasonable jury could not accept the latter version beyond a reasonable doubt.

■ The government responds first by trying to account for Mr. Hinoki's profound weakness as a witness. It points out that Mr. Hinoki had reason in 1998 to deny that an agreement was made because his company then faced potential civil antitrust exposure. It argues that since I may not assess the credibility of the witness, *see United States v. Arache*, 946 F.2d 129,

20. NPI tries to advance another legal argument in this context as well, namely that meeting to discuss how to respond to an anti-dumping suit is not illegal. However, NPI misreads the *Noerr–Pennington* doctrine, which only exempts joint efforts to influence political or judicial decision makers from anti-trust laws. *See McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1558–59 (11th Cir.1992). There is no evidence that the meeting on March 30, 1990, was aimed at formulating a litigation strategy or starting a political action campaign. The Funabashi report, according to the inferences the government would have a jury draw, deals only with a price-fixing strategy, and that is not allowed under the *Noerr–Pennington* doctrine.

21. In Mr. Funabashi's report of the March 30 meeting, the government translated one phrase as expressing Honshu's intent to "cooperate" with the industry. The defense offered an alternative—"to keep up with" or "to go along with." The witness conceded that the Japanese translation of that particular word was very ambiguous.

22. On cross-examination of the trading house representatives, NPI showed that the prices actually tended to fall when they were supposed to be rising or at least stabilizing. I deal with this primarily in the context of the general abandonment of the conspiracy, *infra*, but it could also serve as evidence of competition in what was a buyers' market.

139 (1st Cir.1991), and I am obliged to take the evidence in the light most favorable to the government, *see United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984), I must accept the government's resolution of the conflict between Mr. Funabashi's report and Mr. Hinoki's testimony. The issue here is not just rejecting Mr. Hinoki's testimony on key points; the government would have me accept an alternative picture, which Mr. Hinoki did not paint. Nevertheless, it is a moot point. There is no question that, quite apart from Mr Hinoki's words, his actions in 1990 on behalf of Honshu, and the actions of others, along with other evidence, is consistent with the inference that a price-fixing conspiracy was formed at the March 30 meeting. The corroborating evidence the government offers includes the following:

First, there is evidence of a meeting that predated and set the stage for the March 30 meeting. Mr. Tano of KSK wrote a report memorializing a "Meeting of Four Thermal Paper Companies" that occurred on February 1, 1990 at Jujo's "head office." The purpose of this meeting was reportedly "[f]irst, to put a stop [to price decreases], then announce price increases. If possible [the increases should be] 10% up from April production lot." During this meeting, arrangements were made for a follow-up meeting five days later, also to be held at Jujo's office, the purpose of which was to "[d]isclose price levels for each market, [to] try to put a stop to price decreases [and to] prepare the foundation for launching price increases later on." The companies present at the February 1 meeting, Jujo, KSK, MPM, and Oji, all attended the March 30 meeting as well.

Mr. Tano also memorialized the follow-up meeting on February 6, 1990, at which ten thermal fax paper companies, including the four from the meeting on February 1, were in attendance. Again, the discussion indicated that the manufacturers "[w]ould like to establish the lowest price and then increase prices 10% from around April." The government plausibly argues that these two meetings "la[id] the groundwork" for obtaining an "agreement and approval" from each company "to revise prices."

The government also introduced evidence from after the March 30 meeting consistent with the inference that a conspiracy to fix prices was formed at that time. On the very same day as the meeting, Mr. Hinoki and Mr. Funabashi went to the offices of Mitsui–Tokyo, one of the Japanese trading houses that handled thermal fax paper sales for both Honshu and Jujo, and met with Mr. Sato of Mitsui to inform him about the agreement. Mr. Sato memorialized what they told him in a faxed report to Mitsui's offices in the Unites States. His report stated:

(1) [We] heard that a *Japan thermal paper mills export maker meeting* was held today, with Jujo as the group leader, and prices were discussed. (2) The result was to *increase prices* by 10 PCT from the May/90 production lot. That is, to set up a new price level as follows.... Price: USD 20.00 PER 100 M2 import duty paid and delivered [emphasis in the original].

Further, Mr. Hinoki twice transmitted, without qualification or correction, Mr. Funabashi's report describing what transpired at the March 30 meeting. First, on March 31, 1990, Mr. Hinoki and Mr. Funabashi gave a copy of the report to Mr. Hinoki's supervisor at Honshu, Mr. Onitsuka. Then, on April 2, 1990, Mr. Hinoki faxed a copy of the report to Mr. Takeyama in Honshu's Seattle office. Mr. Hinoki even attached a report of his own making (referred to above) which said that "[a] thermal paper export manufacturer conference was held, and it was decided to implement price increases from May." These acts of forwarding Mr. Funabashi's report to his boss and his colleague in the United States, along with his own attached report in the second instance, surely permit the inference that Mr. Hinoki thought in 1990

that an agreement to fix prices had been struck.[23]

What was happening at Honshu immediately following the meeting was mirrored by what was happening at MPM. Mr. Oba of Mitsubishi Corporation ("MC"), the Japanese trading house responsible for sales of thermal fax paper manufactured by MPM, testified that he was summoned by Mr. Ishigaki of MPM to come to MPM's office so that Mr. Ishigaki could explain to Mr. Oba the details of a recent manufacturers' meeting. Mr. Ishigaki too was a named attendee at the February 1 meeting; MPM was also represented at the meetings on February 6 and March 30. Mr. Ishigaki related to Mr. Oba that the manufacturers had agreed at their recent meeting to increase prices for the sale of thermal fax paper to the United States and other markets. According to Mr. Oba, Mr. Ishigaki said that the manufacturers "fixed the price by territory." Mr. Ishigaki then instructed Mr. Oba to have MC implement the new price scheme starting from April or May of 1990.

With regard to the claim that the representatives at the March 30 meeting did not have the authority to bind their respective corporations, the government responds that Mr. Hinoki's actions belie that claim as well. When Messrs. Hinoki and Funabashi visited Mr. Sato at Mitsui (Honshu's and Jujo's Japanese trading house), they told him not just that a price increase had been proposed, but that a decision had been reached, the result being "to *increase prices* by 10 PCT" [emphasis in the original]. Similarly, Mr. Funabashi's March 31 report stated not that Honshu and the other manufacturers were waiting on authorization from higher-ups before com-

mitting to the price-fixing agreement, but rather that "agreement and approval was obtained from each company." And shortly thereafter, Mr. Ishigaki of MPM summoned Mr. Oba of his Japanese trading house to confirm the manufacturer's agreement with him as well. As the government argues, "[t]his picture of multiple manufacturers's representatives rushing . . . to advise trading houses and others of the newly-forged agreement eviscerates NPI's position that the representatives needed time after the March 30, 1990 meeting to obtain authority to bind their respective companies to the deal." Furthermore, looking at the March 30 meeting in context with the two meetings in February, it is a reasonable inference that the manufacturers would have sent representatives to the March 30 meeting who had authority to commit their respective companies.

With regard to the claim that Honshu, and presumably others, negotiated their prices according to each customer, rather than setting them across-the-board, the evidence is consistent with the government's price stabilization theory: Honshu was simply planning to be flexible in deciding how to try to raise or stabilize its prices. In other words, Honshu would negotiate distinct contracts with each different customer while simultaneously working on raising its average price 10% or to some other particular level.

Finally, with regard to the claim that prices did not in fact rise, the government notes that it need not prove that a price-fixing conspiracy was successfully implemented, only that the agreement was made and that some substantial steps were taken to try to implement it. In any

---

**23.** The government also cites a report generated on April 5, 1990, by Mr. Watanabe of "Mr. Fax," one of Honshu's customers. The report said that he was "suddenly" visited by three people, one of whom was Mr. Motoyama, the manager responsible for Oji's sales of thermal fax paper to the United States market. According to Mr. Watanabe, Mr. Motoyama stated that the "mills have decided [on a] new export price at [the] meetings of last week" and that "Oji has announced [a] new price by 10% increase." This report is particularly noteworthy given that Mr. Motoyama was a named attendee at the meeting on February 1, and that his firm, Oji, was represented at both the February 6 and March 30 meetings.

event, as I have noted, by the end of the trial, the government changed its theory to address this issue. No longer was it claiming a conspiracy to *raise* prices; this case involved, they now suggested, a conspiracy to stabilize prices, to fix their fall, an equally impermissible goal.

Given the strictures of the Rule 29 standard, I conclude that the government has established the existence of a conspiracy, at least as of March 30, 1990.

## 2. *Evidence that Jujo Was a Member of a Price–Fixing Conspiracy*

█ The evidence that Jujo joined the conspiracy is somewhat weaker, but still not so weak that a jury could not reasonably find beyond a reasonable doubt that NPI was guilty of having joined the conspiracy, at least at its inception.

The government starts its case referring to two observations in the report of Mr. Funabashi. First, he reports that Jujo was not only at the meeting of ten manufacturers on March 30, 1990, but at the preliminary meeting, held an hour before the main meeting, which Mr. Funabashi described as a meeting of "the five major companies." It would be odd for Jujo to be a "major company" and yet to play a passive or spectator's role. Second, Mr. Funabashi reports that *all* of the companies in attendance at the main meeting agreed to and approved the collective price revision scheme.[24]

In addition, the government points out that Jujo was a host for the earlier February meetings, raising the inference that it had a leading role in the formation of the conspiracy. In addition, the government points to a memorandum from Mr. Sato of Mitsui's to Mitsui's offices in the United States, where Jujo's thermal fax paper was distributed, which describes Jujo, based on what Messrs. Hinoki and Funabashi told him, as "the group leader" of the March 30, 1990 meeting.

In a similar vein, the government cites a correspondence faxed by Mr. Ito of Mitsubishi International Corporation, MPM's American trading house in New York, to MC in Tokyo on April 9, 1990. In this document, Mr. Ito relates that he spoke with a representative of Mitsui–New York, the U.S. trading house responsible for sales of thermal fax paper for both Jujo and Honshu. Specifically, he says that "[i]t seems that Jujo talked to [Mitsui–New York] regarding $20.00—Jujo's deadline is the 15th, therefore no individual PRICE has been presented yet." This suggests according to the government, that Mr. Ito learned from the conversation with the representative from Mitsui–New York that Jujo had already advised Mitsui–New York, that a new $20.00 price was in the works, even if not yet finalized.

The information that Mr. Ito relayed dovetails with what Mr. Sato of Mitsui–Japan said he would give to Mitsui. In his memorandum to Mitsui–New York, Mr. Sato wrote that "[we] will obtain [information] on the detailed situation separately from JUJO next week and let you know." This memorandum was written ten days before Mr. Ito confirmed that Mitsui–New York had received some preliminary confirmation from Jujo about the agreed-upon $20.00 price level. Thus the government infers that Jujo "promptly started in the first week of April of 1990 to notify its trading houses of the agreed-upon price for purposes of implementing the agreement."

Finally, the government cites to a report sent by a representative of Japan Pulp and Paper's ("JPP") Tokyo office to JPP–New York detailing a pricing instruction recently given to JPP–Tokyo over the telephone by a person that seems clearly to be a Jujo representative, someone named Saito (JPP, along with Mitsui, distributed Jujo goods). The inference that Saito is a Jujo representative is grounded in the fact that the rest of the information conveyed by

---

**24.** As noted above, NPI contests the translation of "Sando" as "agreement." For pur- poses of this motion, I am obliged to accept the government's version.

Saito relates to recent trends in Jujo's production, Jujo's research regarding intellectual property rights, and Jujo's starting to consult with attorneys. The report by the representative at JPP–Tokyo says that, as Saito "explained over the phone the other day, [we] are offering a $20.00/100m2 price with free delivered duty paid from May." This too indicates that Jujo had taken steps to effectuate the manufacturers' March 30, 1990 agreement.

NPI responds that this data establishes nothing more than guilt by association. The fact that Jujo attended the meetings in February and March does not imply that it joined in the conspiracy. Mr. Funabashi's report characterizes what happened—that "agreement and approval was obtained from each company to revise prices"—but it does not indicate that anyone from Jujo did anything in particularly to clearly or affirmatively agree to join the conspiracy. More specifically, NPI argues that the government was unable, throughout the trial, to provide any evidence regarding who from Jujo attended the meetings and whether that person had any binding authority with regard to Jujo's pricing decisions.

With regard to the argument that Jujo must have been a major player because Mr. Sato described it as the "group leader," NPI responds that being a "group leader" means nothing more than that Jujo was the chair or moderator of that meeting, in a system in which the chair rotated from company to company.[25] The document does not indicate that Jujo itself made any particular statements. Mr. Sato does indicate that he "will obtain [information] on the detailed situation separately from Jujo next week and let you know." But this does not imply that Jujo actually did or said anything that committed it to the conspiracy as of that date.

NPI also argues that none of the other documents mention any specific acts taken by Jujo which show that it was more than

present when price-fixing was discussed. And, as it points out, "[m]ere presence at the scene of a crime is insufficient to prove membership in a conspiracy," and even if "[i]t is fair inference that the defendant knew what was going on, ... that is not enough to establish intent to conspire." *United States v. Ocampo*, 964 F.2d 80, 82 (1st Cir.1992).

With regard to the fact that no company at the March 30 meeting spoke up and objected to KSK's $20.00/100m2 proposal, NPI argues that silence need not imply assent. Indeed, it offers another explanation for the silence, namely that any company that spoke out against KSK's proposal ran the risk of KSK passing that on to the American company that was threatening to bring the anti-dumping lawsuit.

Finally, NPI argues that there is no evidence that its prices actually rose at all. While the government argues that there is no requirement of showing that the price-fixing agreement was ever implemented, plainly the failure of implementation suggests that there was no such agreement. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 592, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That evidence, while not dispositive during the immediate post-March 30 period, is compelling by the fall of 1990.

Viewing the evidence in the light most favorable to the United States, however, it is clear that a reasonable jury could find beyond a reasonable doubt that Jujo joined the conspiracy at or about March of 1990. Whether Jujo's participation continued into the limitations period and indeed, whether the conspiracy itself lasted, is another question.

### 3. *Evidence that the Conspiracy Had Dissolved Before the Limitations Period*

While the law on withdrawal from a conspiracy is fairly stringent, there is am-

---

**25.** Initially, the government's translator suggested "group leader," while NPI's translator suggested "moderator." The government's translator then adopted the latter translation.

ple evidence to meet the Rule 29 standard that the conspiracy had fallen apart well before November 15, 1990, and that, in any event, Jujo was no longer a member as of that date.

■ The standard for withdrawal from a conspiracy requires more than "[m]ere cessation of activity in furtherance of the conspiracy." *United States v. Juodakis,* 834 F.2d 1099, 1102 (1st Cir.1987). *See also United States v. Munoz,* 36 F.3d 1229, 1234 (1st Cir.1994). "In order to withdraw, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy." *Juodakis,* 834 F.2d at 1102. "Typically, there must be evidence either of a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." *Id.*

■ But it would be a mistake to read the communication option too narrowly, as if Jujo could successfully withdraw from the conspiracy if, and only if, it made an announcement to all the other manufacturers that it was withdrawing from the conspiracy. In *United States v. Gypsum, Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), for example, the Supreme Court found that the trial judge erroneously instructed the jury that the only way to withdraw from a price-fixing conspiracy was for the defendant to "affirmatively notif[y] each other member of the conspiracy he will no longer participate in the undertaking so they understand they can no longer expect his participation or acquiescence." 438 U.S. at 463–64, 98 S.Ct. 2864. Rather, the Court held that "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *Id.* at 464–65, 98 S.Ct. 2864. The clear implication was that "resumption of competitive behavior, such as intensified price cutting or price wars," *id.* at 464, 98 S.Ct. 2864, would be sufficient to communicate withdrawal or general abandonment of a price-fixing conspiracy. *See United States v. Swiss Valley Farms Company, Inc.,* 912 F.Supp. 401, 402 (C.D.Ill. 1995) (citing *Gypsum* for the proposition "that evidence showing a resumption of competitive bidding by Defendants is also admissible as affirmative action to defeat or disavow the purpose of the bid rigging conspiracy."). Indeed, as in the instant case, the defendants in *Gypsum* wanted to argue that vigorous competition had returned before the applicable five year statute of limitations period had started to run. 438 U.S. at 465 n. 38, 98 S.Ct. 2864.

■ The evidence that Jujo did not follow through as a member of the conspiracy, and surely had withdrawn by November 15, 1990, starts with another document written by Mr. Sato of Mitsui on May 7, 1990. He writes:

Today I obtained the following information from Mr. Takemoto of Jujo:

1) They currently are reviewing internally what the future pricing should be in response to the anti-dumping problem, and hope to prepare Jujo's policy and determine the direction for consultation with [Mitsui] within one or two days.

2) [He says] basically, the direction is for Jujo to respond with independent pricing, separately from the other makers including Oji, Taio, Mitsubishi and Honshu, as otherwise (because it is conceivable that offering similar price increases [as theirs] would only serve to deepen the problem).

Clearly, Jujo has communicated here to one of its trading houses, one that dealt also with another member of the alleged conspiracy, Honshu, that it was going to make its own independent judgments of how to handle the threat of an anti-dumping suit, and that it was not, or was no longer going to coordinate any prices with other members of the conspiracy. Indeed, another document from Mitsui, recording conversations with two Jujo employees, shows that Jujo was consulting indepen-

dently with counsel in Washington D.C. to determine how to respond with pricing to the anti-dumping threat.

Moreover, from the outset following the March 30 meeting, Jujo's response to the anti-dumping threat was clearly to engage in individualized, customer-by-customer price negotiations. Individualized, customer-by-customer price negotiations pave the way for a competitive market. Though, as indicated above, they are compatible with a flexible approach to price-fixing, a pattern of price stabilization, there is a point at which the pattern of pricing proves something totally different. If prices in fact consistently go down, as they did by May, June, and thereafter, individualized negotiations become the mechanism by which real competition takes place. In other words, they are the way in which former conspirators break ranks and start to engage in a price war to save their customer base. And a price war began.

Witness after witness testified that price data from Jujo and their competitors shows that while some prices went up initially to the $18/100m2 range, some did not change, and some fell. Indeed, by mid 1990, and later, a reasonable fact finder looking only at prices, would be obliged to conclude that the conspiracy had evaporated. Jujo's prices continued to fall. KSK's and Oji's prices dropped from $19.00 in March 1990 to $15.01 in December 1990, while Mitsubishi's prices to one customer dropped from $18.30 in August, to $16.68 in December. One government witness admitted that there was a "price war" among all the thermal paper manufacturers beginning July 20, 1990, and lasting through the fall. Another characterized the 1990 market as "wickedly competitive," prices were going "down, down, down."

Indeed, by mid 1990, prices were so low that Appleton was still threatening the manufacturers' including Jujo—with an anti-dumping petition.[26] Oji, in particular, was regularly undercutting its competitors. Competitors knew what each other was charging, had customers in common from whom they obtained price information and were knowingly undercutting each others' prices.

By the fall of 1990, raising prices made no economic sense whatsoever, if it ever did, whatever the justification. Any movement towards raising prices, had precisely the same devastating effect on these manufacturers that an anti-dumping tariff would have had. The American manufactures had captured so much of the business that the Japanese manufacturers were irrelevant. (*See* Section D *infra* on "substantial effects.")

To be sure, the government cites certain specific prices that Jujo charged certain specific customers that did not drop during 1990. But as NPI points out, this is explained by contractual price commitments to those customers. The *prices* between customers varied and tended to drop over the course of the year in a way that one would not expect in a non-competitive market. And the general pattern of falling prices is particularly impressive given that all the manufacturers were sensitive to the continued threat of an anti-dumping suit, and thus necessarily were wary about lowering their prices.

Finally, while there is a plethora of telexes and memoranda concerning a March 30 meeting ostensibly to "fix prices," there is no credible evidence of subsequent meetings in the fall of 1990 that had the same purpose or the same effect (even for a short time).[27]

---

26. KSK (the Japanese parent to KSP, the American company working with Appleton Paper) reported that based on the data it was analyzing, Jujo and the others were "dumping" paper in the American market in June of 1990—when Appleton wrote to the Ministry of International Trade and Industry of Japan, as well as in August of 1990.

27. A telex sent from DaiEi Papers, New Jersey, to DaiEi, San Francisco, simply reports a thermal paper manufacturer's meeting at which MPM reported Appleton's threat to file an anti-dumping petition Oji and Daio. The tone of this report and its content is wholly different from the March 30 Funabashi memorandum. Likewise, a fax between Mitsui

Taking into account all of the evidence presented at trial, even when viewing it in the light most favorable to the government, I conclude that it is clear that whatever agreement had existed in March, had dissolved by mid 1990. Jujo was striking out on its own by May 1990; any conspiracy to fix prices generally collapsed by the summer or early fall of the year. NPI has carried its burden of showing that it withdrew from the conspiracy to fix prices, and that the conspiracy was generally abandoned, before the limitations period. Accordingly, I hold that the government failed to establish the first two elements of Count 1 within the relevant limitations period.

### D. *Failure to Present Sufficient Evidence that Any Continuing Conspiracy Had Substantial Effects*

As an alternative ground for acquittal, even assuming that the conspiracy was ongoing, and that Jujo was still a member of the conspiracy, I hold that the government failed to carry its burden of showing that the conspiracy had substantial effects in the United States after November 15, 1990.

 In § 1 of the Sherman Act, the very same phrase conveys both a jurisdictional requirement and a merits requirement. The phrase "in restraint of trade or commerce among the several states", 15 U.S.C. § 1, is "both an element of the offense and a vital prerequisite for federal court jurisdiction." *Mortensen v. First Federal Savings and Loan Assoc.*, 549 F.2d 884, 890–91 (3d Cir.1977).

Several questions follow: Is the standard for proving jurisdiction the same as the standard for proving effects on the merits? To what degree is the standard

affected by the fact that a price-fixing conspiracy is involved which in a domestic setting is a per se restraint on trade.

Logic suggests that the basic standard is the same for proving either jurisdiction and the third element of the offense on the merits. The language of § 1 is the same; the primary concerns of one mirror the concerns of the other—whether the federal law can be applied to NPI's actions. While there may be additional concerns (such as concerns about international comity) that may be appropriate for the judge to consider in determining jurisdiction, the core question is, or should be, the same.

Moreover, this is particularly so where the factual determination necessary for one, overlaps with the factual determination necessary for the other. *See id.* at 893 (*quoting McBeath v. Inter–American Citizens for Decency Committee*, 374 F.2d 359 (5th Cir.) *cert. denied*, 389 U.S. 896, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967)) ("[W]here the factual and jurisdictional issues are completely intermeshed the jurisdictional issues should be referred to the merits, for it is impossible to decide the one without the other.")

The requirement that the First Circuit reaffirmed in its decision in *Nippon*, that the government prove "intended" as well as "substantial effects" on interstate commerce, reflects the special concerns attendant to prosecuting a wholly foreign conspiracy. As Judge Learned Hand wrote in his seminal opinion in *United States v. Aluminum Co. of America*, 148 F.2d 416, 443 (2d Cir.1945), "[w]e should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States." *Hartford Fire* since stated the standard for civil suits of foreign defendants, saying that "it is well estab-

---

trading houses, confirms that what was happening was not the lock-step participation in a price-fixing conspiracy, but rather a company struggling to discount prices while avoiding dumping charges. The only evidence the government has for the fall of 1990 is that there was continued talk among manufactur-

ers about a threatened anti-dumping petition, which is hardly illegal. Indeed, to the extent that those threats hung in the air, they suggested that there were no contrived price increases or price stabilization. For the threats to be credible, prices had to be quite low.

lished by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." 509 U.S. at 796, 113 S.Ct. 2891. The First Circuit's opinion in *Nippon* extended that same standard to criminal defendants. 109 F.3d at 9.

■ In a domestic price-fixing case, the third prong of § 1 imposes a minimal standard. Proof of the conspiracy and an overt act are per se proof of a substantial impact on the market. The question is whether the standard is any different when the government alleges that a foreign entity has engaged in price-fixing, when the concerns about price-fixing meet the concerns about extraterritorial prosecutions.

As I noted during the trial, there are two general templates for evaluating jurisdictional issues involving restraints on trade: a per se test and a "rule of reason" test.

The per se model is the traditional domestic price-fixing conspiracy in which courts have not required an appraisal of the actual magnitude of the impact in a domestic setting. Price-fixing is the paradigm of an act in violation of § 1 of the Sherman Act. As Areeda says, "price-fixing cartels are condemned per se because the conduct it tempting to businessmen but very dangerous to society. The conceivable benefits are few in principle, small in magnitude, speculative in occurrence, and always premised on the existence of price-fixing power which is likely to be exercised adversely to the public." VII Phillip Areeda and Herbert Hovenkamp, *Antitrust Law* ¶ 1509, at 412 (1997). In line with this, the Supreme Court held that "[w]hatever economic justification particular price-fixing agreements may be thought to have, the law does not permit

an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

■ The "rule of reason" approach is typically applied to restraints of trade not involving price-fixing or claims of vertical conspiracies. In those cases, proof that a given set of acts took place did not necessarily mean that they had a "substantial effect" on the market. The specific impact had to be proved under a "rule of reason" analysis which considers multiple factors.

The activities of these foreign manufacturers could fit into the first or the second category, depending upon the circumstances. In the abstract, there may well be a foreign analog of a domestic price-fixing conspiracy, where the acts alleged were of such a nature that there was no doubt about the impact, where "the anti-competitive nature and effect" of the practice is "so apparent and so serious that the courts will not pause to assess them in the light of the rule of reason." *United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). Alternatively, there may well be the foreign analog of a vertical conspiracy, where the anti-competitive nature of the activity depends upon a number of factors, where the government's proof is less clear, where there is an issue about the relationship between the Japanese acts and the American effect.[28]

NPI, expressly relying on *Metro Industries v. Sammi Corp.*, 82 F.3d 839 (9th Cir.1996), argues that an international price-fixing, unlike a domestic price-fixing, is subject to different rules in all cases— i.e. a rule of reason test. The court in *Metro Industries* relied on the following quotation from Areeda to justify invoking the "rule of reason" analysis:

**28.** I warned the government that "[i]t appears that the government is prepared to take its chances ... that its proof would be ... so clear that it necessarily produces substantial effects or it will be domestic enough that the

jurisdiction issue will be beside the point. If the government wants to take its chances that that's the nature of the proof, then I will reserve this issue until trial, until at the conclusion ... on a directed verdict...."

[T]he conventional assumptions that courts make in appraising restraints in domestic markets are not necessarily applicable in foreign markets. A foreign joint venture among competitors, for example, might be more "reasonable" than a comparable domestic transaction in several respects: the actual or potential harms touching American commerce may be more remote; the parties' necessities may be greater in view of foreign market circumstances; and the alternatives may be fewer, more burdensome, or less helpful. The fact that foreign conduct would be a per se offense—one that is condemned without proof of particular effects and with little regard for possible justifications in the particular case—when entirely domestic does not call for a fundamentally different analysis. Domestic antitrust policy uses per se rules for conduct that, in most of its manifestations, is potentially very dangerous with little or no redeeming virtue. That rationale would be inapplicable to foreign restraints that, in many instances, either pose very little danger to American commerce or have more persuasive justifications than are likely in similar restraints at home. For example, price-fixing in a foreign country might have some but very little impact on United States commerce.

*Metro Industries*, 82 F.3d at 845 (*quoting* 1 Phillip Areeda & Donald F. Turner, *Antitrust Law* ¶ 237 (1978)). Based on this quite reasonable awareness of the differences between domestic and foreign economic activity, the court in *Metro Industries* concluded that whenever "a Sherman Act claim is based on conduct outside the United States, we apply rule of reason analysis to determine whether there is a Sherman Act violation." *Id.*

NPI, in turn, recommends the same reasoning to me. It argues that the government failed to show that there were substantial effects because it "failed to establish any other evidence as to how

much, if any, of that market was affected by the alleged conspiracy."

The problem with NPI's position is that the *Metro Industries* court was wrong to apply the rule of reason analysis to a price-fixing case *just because* the defendant is foreign. No such test was implied by *Hartford Fire*. Indeed, Areeda notes:

> *Metro Industries's* use of the rule of reason treatment for all restraints abroad [ ] is squarely in conflict with the First Circuit's *Nippon* decision that a criminal indictment may issue for naked price-fixing occurring abroad but having the United States as its intended target. As a general matter, rule of reason offenses are not the product of criminal prosecutions. At least on the facts of the *Nippon* case, we are inclined to favor the First Circuit's conclusion over that of the Ninth Circuit.

IA Phillip Areeda and Herbert Hovenkamp, *Antitrust Law* ¶ 273b, at 379 (1997).

More substantively, the reason the *Metro Industries* court was wrong is that it failed to appreciate both the context for the lengthy quotation taken from Areeda, and the underlying justification for use of a per se test in the case of price-fixing. The Areeda quotation concluded with the thought that "price-fixing in a foreign country might have some but very little impact on United States commerce." But this is consistent with the thought that *if* the conspiracy were intentionally directed at the United States, and *if* it had the capacity to have substantial effects on the United States, then it would be the sort of activity which would be a matter of serious concern to the United States.

Because price-fixing is the paradigm of a § 1 violation, Areeda is clear to distinguish it from other sorts of anticompetitive action which might be treated more leniently in a foreign country. Thus he says, "to say that domestic per se rules are not necessarily and automatically applicable in the international context is not to say that an antitrust court needs to hesitate very long before condemning restraints with

significant and obvious effects on United States commerce, and without any plausible purpose other than the suppression of competition with and in the United States." IA *Antitrust Law* ¶ 273b, at 376 (1997).

■ The correct approach to a foreign price-fixing conspiracy, therefore, is what the First Circuit announced, something akin to a "per se plus" test, adding to the traditional domestic analysis the requirement that the government show substantial effects by showing a substantial connection to the United States market.

I instructed the jury on this "per se plus" test by saying that substantial effects could be shown in any of the following ways:

- whether the volume of commerce affected by the conspiracy was substantial;
- whether the share of the market allegedly impacted by alleged conspiracy was substantial;
- whether the conspiracy as a whole substantially lessened competition in the thermal fax paper market.

■ The government claims that it made sufficient proof of all three. I will acknowledge that the government carried its burden with regard to substantial effects on either of the first two prongs but only around the time the conspiracy allegedly was formed, i.e. around the end of March, 1990. It presented sufficient evidence that Jujo had approximately $6 million in sales in the United States at the start of the alleged conspiracy, and that the Japanese thermal fax paper manufacturers as a whole had approximately thirty percent of the market at the time.[29]

The problem with the government's position is that the evidence indicates that the Japanese share of the market collapsed during 1990. Witness after witness testified to the fact that any company that did raise its prices lost market share at a precipitous rate. The pattern of prices suggested that by mid 1990, most abandoned the enterprise. Even so, document after document suggested that the market for Japanese thermal fax paper, not too robust at the beginning of 1990, was virtually extinguished by the end of the year. McCall of DaiEi reports that Japanese competitors had become an "insignificant" force in the market place. Appleton and KSP, the American companies continued to aggressively compete with one another, and, although they had captured so much of the market, continued to threaten anti-dumping petitions in order to drive out any of the remaining Japanese manufacturers left standing. The American companies plainly had the capacity to supply the entire demand for thermal fax paper by the fall of 1990. The Japanese conspiracy—if anything remained by November of 1990—could hardly have had a "substantial effect" on American commerce.

It should be emphasized that a substantial effect on United States commerce cannot simply be assumed to continue because it once existed. There is no reason to treat having substantial effects on United States commerce like being a member of a conspiracy, which, as discussed above, is held to continue until its goals or membership have been affirmatively abandoned. *See Juodakis*, 834 F.2d, at 1102. Rather, because it is a matter of objective fact, rather than subjective intent (to agree), the government must prove that the test is met at the relevant time. Because the government failed to introduce any evidence on this point for the relevant time

---

**29.** NPI claims that "Japanese manufacturers lacked sufficient market power, as a matter of law, to cause a substantial effect on United States commerce." In support of this claim, it offers the following quote from Areeda: "Most recent cases dismiss cases as a matter of law where the defendant's market share is less than 50 percent." This quote is taken from ¶ 801, but ¶ 801 deals with § 2 of the Sherman Act, not § 1. It's concern with "substantial" market share is with what it takes to be a monopoly. This has no bearing on what is required to have a substantial share of the market under the per se plus test for foreign price-fixing.

period, and has not rebutted the testimony of almost all the witnesses whose conclusions were adverse to the government, it cannot claim to have carried its burden of showing that the alleged conspiratorial conduct produced substantial effects in the United States.

## V. CONCLUSION

For the reasons detailed above, I find that the government has failed to carry its burden of proof on any of the three elements of the price-fixing conspiracy on which NPI is charged. That is, the government failed to show that as of November 15, 1990—the date marking the start of the period covered by the statute of limitations—there was a conspiracy to fix prices, that Jujo, NPI's predecessor, was a member of such a conspiracy, or that such a conspiracy had intended and substantial effects on United States commerce. Accordingly, NPI's renewed motion for acquittal (docket # 260) is *GRANTED.*

SO ORDERED.